# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3536

JAMES R. KING,

*Plaintiff,*

*v.*

ILLINOIS STATE BOARD OF
ELECTIONS, DAVID E. MURRAY,
LAWRENCE E. JOHNSON, et al.,

*Defendants-Appellants,*

*v.*

BOBBY RUSH, TIMUEL BLACK,
AL JOHNSON, et al.,

*Intervening Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 95 C 827—**David H. Coar**, *Judge.*

_____

ARGUED OCTOBER 28, 2004—DECIDED JUNE 13, 2005

_____


Before RIPPLE, WOOD and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The Illinois State Board of Elections
("the State" or "Board of Elections") appeals a district court

decision ordering it to pay attorneys' fees and costs to the defendant-intervenors in a voting rights suit. In the underlying action, Illinois voters had sued the State for injunctive and declaratory relief on the ground that a map of congressional districts adopted after earlier, related litigation violated their constitutional rights. Other Illinois voters (collectively, "the intervenors") were permitted to intervene and defend the map. The United States government also intervened. After a three-judge court rendered a decision against the plaintiffs, the intervenors petitioned for, and the court granted, attorneys' fees and costs to be paid by the State. For the reasons set forth in the following opinion, we affirm the award of fees and costs.

# I

# BACKGROUND

Before turning to the attorneys' fee issue now before us, we shall review the redistricting litigation which resulted in the map challenged in this case.

## A. The *Hastert* Litigation

In 1991, after the Illinois State Legislature failed to implement a constitutionally sound redistricting plan based on the 1990 census, a group of Republican members of the Illinois congressional delegation brought suit against the Board of Elections. *See Hastert v. State Bd. of Elections* ("*Hastert I*"), 777 F. Supp. 634, 638 (N.D. Ill. 1991). The plaintiffs sought to have the congressional districts as drawn at that time declared unconstitutional and to have their own redistricting proposal adopted as a replacement. *Id.*

At the same time, a group of African-American and Hispanic voters from Illinois brought a similar suit; in addition to seeking a declaration that the current congressional districting map was unconstitutional, these plaintiffs also sought the creation of a majority-Hispanic congressional district, which they claimed was mandated by § 2 of the Voting Rights Act, 42 U.S.C. § 1973. *Hastert I*, 777 F. Supp. at 638. The two suits were consolidated for decision by a three-judge district court. *See* 28 U.S.C. § 2284(a). The suits later were consolidated with two other actions brought by groups of Illinois voters seeking to have implemented other redistricting plans. *Hastert I*, 777 F. Supp. at 638.

The three-judge district court in *Hastert I* determined that the Illinois congressional districts as then drawn were unconstitutional.[1] *Id.* at 661-62. Because the state legislature had not adopted a new congressional map, the court also considered two redistricting plans (the "*Hastert* plan" and the "*Rosebrook* plan") that had been proposed by various plaintiffs, both of which "would have passed constitutional and legal muster had either plan been the product of the state legislative process." *Id.* at 662. The court adopted the *Hastert* plan, finding it "best satisfie[d] the criteria" set by the Supreme Court for evaluating congressional districting plans. *Id.* According to the district court, the *Hastert* plan realized "precise mathematical equality of population across congressional districts." *Id.* The *Hastert* plan also achieved the "fairness to the voting rights of racial and language

---

[1] The district court noted that the State did not play an "active role" in the *Hastert* litigation; "[t]he adversarial circumstances necessary to constitute a case or controversy ar[o]se solely from competing redistricting plans submitted by the various plaintiffs." *Hastert v. State Bd. of Elections* ("*Hastert I*"), 777 F. Supp. 634, 639 (N.D. Ill. 1991).

minorities" mandated by § 2 of the Voting Rights Act, 42 U.S.C. § 1973, by creating a Hispanic-super-majority district (the current Fourth Congressional District) and preserving three existing districts in which African-Americans constituted the majority (including the current First Congressional District). *Hastert I*, 777 F. Supp. at 662. The district court also ordered all parties to pay their own costs. *Id.*

The plaintiffs moved to alter or amend the judgment on costs. The district court denied the motion and held that, although some of the plaintiffs did qualify as "prevailing parties" under the relevant statutes allowing for the award of attorneys' fees and costs, 42 U.S.C. §§ 1973*l*(e) & 1988, "special circumstances" prevented it from awarding fees and costs. *Hastert v. State Bd. of Elections* ("*Hastert II*"), 794 F. Supp. 254, 260-61 (N.D. Ill. 1992).

On appeal from the district court's decision not to award fees and costs,[2] this court affirmed the district court's conclusion that some of the plaintiffs (including Bobby Rush, Al Johnson and Neomi Hernandez, all of whom are intervenors in this case) were "prevailing parties" under the relevant statutes and reversed the district court's decision to deny fees. *Hastert v. Illinois State Bd. of Election Comm'rs* ("*Hastert III*"), 28 F.3d 1430, 1440, 1443 (7th Cir.), *cert. denied*, 513 U.S. 964 (1994). Rejecting the district court's determination that "special circumstances" existed, this court held that the

---

[2] This court did not have jurisdiction to hear the appeal of the *Hastert* litigation on the merits; any appeal had to be made directly to the Supreme Court of the United States. 28 U.S.C. §§ 1253 & 1291; *see also Hastert v. Illinois State Bd. of Election Comm'rs* ("*Hastert III*"), 28 F.3d 1430, 1436-37 (7th Cir.), *cert. denied*, 513 U.S. 964 (1994). However, we had jurisdiction over the district court's denial of attorneys' fees. *See Hastert III*, 28 F.3d at 1436-37.

State was "accountable for the prevailing parties' attorneys' fees" because it had "fail[ed] to vindicate important rights." *Id.* at 1444.

We pointed out that redistricting cases often present "peculiar circumstances" with respect to "thorny fees matters." *Id.* We further noted the difficulty of declaring a "winner" when "all of the plaintiffs 'contributed' to the final result in the sense that . . . all parties arguably helped move the process forward toward its eventual culmination"—but determined that the "winners" were those of whom it could be said "exactly what they advocated has been accepted." *Id.* The court reasoned:

> The State Board of Elections, the nominal defendant, has no interest in the eventual outcome except that there *be* an outcome which it can implement. Yet the State Board may be held liable for fees to the prevailing parties, whose status as such depends upon the *relative* success of their position in relation to the success of the other plaintiffs. These configurations of claim to liability and of success to failure are essentially unique to redistricting cases. . . . In [redistricting cases], we are attempting to apply principles developed in a wide range of civil rights cases to the *sui generis* category of redistricting cases. As might be expected, these principles do not provide a close fit to this subject matter.

*Id.* (emphasis in original). The court noted that, in redistricting cases, the application of fee-shifting statutes typically results in liability being "imposed on a neutral (and nominal) defendant, and successful fees claims [being] awarded to the *relatively* successful plaintiffs." *Id.* (emphasis in original).

### B. Facts

This suit presented a challenge to the *Hastert* plan. On February 9, 1995, plaintiffs PAC for Middle America ("PACMA"), William J. Kelly and James R. King brought this action for injunctive and declaratory relief against the Board of Elections and members of the Board of Elections in their official capacities. Plaintiff King is a resident and registered voter in Illinois' Fourth Congressional District. Plaintiff Kelly is a resident and registered voter in Illinois' First Congressional District. PACMA has members in both the First and the Fourth Districts.

The plaintiffs alleged that, in light of the Supreme Court's decision in *Shaw v. Reno*, 509 U.S. 630 (1993), Illinois' First and Fourth Congressional Districts were "so highly ir-regular" that they could not "be rationally understood as anything other than an effort to separate voters into differ-ent districts on the basis of race." R.1 at 5. Therefore, the plaintiffs contended that an election conducted according to the map adopted in *Hastert I* would violate "the Constitu-tion of the United States, Article I, Section 2, the Fourteenth Amendment, Sections 1 and 2, and Fifteenth Amendment; 42 U.S.C. § 1983 and the rights of Plaintiffs in particular." R.1 at 5.

### C. District Court Proceedings on the Merits of the Case

A three-judge district court was convened to hear and determine the case. *See* 28 U.S.C. § 2284(a). The State moved to dismiss the complaint on the ground that the plaintiffs lacked standing because their injury was not fairly traceable to the State and on the ground that the suit was barred by the doctrine of laches. The district court denied the State's motion to dismiss.

In May 1995, supporters of the *Hastert* plan who resided and were registered voters in Illinois' First and Fourth Congressional Districts, sought leave to intervene as defendants (when necessary, the intervenors shall be referred to, respectively, as "the First District intervenors" and "the Fourth District intervenors"). Their request was granted in September 1995 . The intervenors argued that the "participation of the State Election Board and its members as defendants [did] not establish that [their] interests as voters and as beneficiaries of the 1991 court decree [in the *Hastert* litigation would] be adequately represented." R.53 at 9.[3] The United States sought leave to intervene later in

---

[3] The intervenors are Bobby Rush, Timuel Black, Al Johnson, Elvira Carrizales, Neomi Hernandez, and the Chicago Urban League. At all times relevant to the present action, Rush was the elected representative for the First Congressional District. Black, Johnson, Carrizales and Hernandez are residents and registered voters in the majority-African-American First Congressional District and the majority-Hispanic Fourth Congressional District. The Chicago Urban League sought to intervene on behalf of its members who reside in the majority-African-American First District. Intervenors Rush, Johnson and Hernandez all were plaintiffs in the *Hastert* litigation and all had been declared "prevailing parties" by this court. *Hastert III*, 28 F.3d at 1440.

Rush, as the First District's elected representative at all times relevant to the litigation, was granted leave to intervene as of right pursuant to Fed. R. Civ. P. 24(a), on the ground that he stood to "lose his base electorate as a result of an adverse ruling." R.68 at 2. The remaining intervenors—Black and Johnson, voters in the majority-African-American First District, Carrizales and Hernandez, voters in the majority-Hispanic Fourth District, and the Chicago Urban League—were permitted to intervene under Fed. R. Civ. P. 24(b). The panel found that their proposed intervention was timely, would not prejudice or delay adjudica-

(continued...)

September 1995 and was granted leave to intervene in November 1995. In October 1995, before trial, Plaintiffs Kelly and PACMA abandoned their challenge to the First District, and that portion of the lawsuit was dismissed.

The three-judge court concluded that the Fourth District was constitutional. *See King v. State Bd. of Elections* ("*King I*"), 979 F. Supp. 582 (N.D. Ill.), *vacated, King v. Illinois Bd. of Elections*, 519 U.S. 978 (1996).[4] Mr. King appealed directly to the Supreme Court, which vacated the district court's judgment and remanded for reconsideration in light of its decisions in *Shaw v. Hunt*, 517 U.S. 899 (1996), and *Bush v. Vera*, 517 U.S. 952 (1996). On remand, the three-judge

---

[3] (...continued)

tion of the underlying case and presented questions of law and fact "virtually identical not only to the issues presently pending before this court but also to the issues raised before the *Hastert* court." R.68 at 7.

The intervenors were represented by two separate counsels, primarily because some of them "were represented separately in the 1991 [*Hastert*] litigation." R.53 at 10-11 n.2. However, the intervenors emphasized that "they ha[d] no desire to engage in duplicative efforts" and "agreed to coordinate their actions . . . and to file joint pleadings on behalf of all movants rather than duplicative separate pleadings." R.53 at 10 n.2.

[4] The *King I* court also declined to transfer the case back to the same three-judge district court that had heard *Hastert*, on the grounds that (1) the chief circuit judge had already assigned the three-judge panel to hear Mr. King's lawsuit and so the law of the case doctrine prevented a transfer; (2) the *Hastert* court had not retained jurisdiction to hear future constitutional challenges to its order; and (3) it would have been difficult or impossible for Mr. King to petition the *Hastert* court for an order vacating or modifying the judgment. *King v. State Bd. of Elections ("King I")*, 979 F. Supp. 582, 588-90 (N.D. Ill. 1996).

district court again concluded that the Fourth District was constitutional. *See King v. State Bd. of Elections* ("*King II*"), 979 F. Supp. 619 (N.D. Ill. 1997). The Supreme Court summarily affirmed. *King v. Illinois Bd. of Elections*, 522 U.S. 1087 (1998).

### D. District Court Proceedings on Attorneys' Fees and Costs

The intervenors then petitioned the three-judge district court for their attorneys' fees and costs pursuant to 42 U.S.C. § 1973*l*(e) and § 1988. On March 6, 2002, the district court issued an order directing the State to pay the intervenors' fees and costs. The district court noted that the relevant statutes allow a court to award attorneys' fees to a "prevailing party" in a voting rights or civil rights case. 42 U.S.C. §§ 1973*l*(e) & 1988. The court stated that, although it was "aware that it [was] treading on uncharted grounds with no controlling precedent to serve as guideposts," the equities of the case, "namely, the . . . nature of redistricting cases" and the "unusual procedural history" of the case, supported an award of attorneys' fees for the intervenors despite their status as intervening defendants. R.204 at 12.

The district court concluded that the equities of the case supported a departure from "the general rule that precludes prevailing defendants from recovering fees" unless a plaintiff's suit was frivolous or vexatious. R.204 at 5. Furthermore, the court concluded that awarding fees to the intervenors for their involvement in this case would further the purposes of § 1973*l*(e) and § 1988. The district court reasoned that the intervenors were doing the work of "traditional civil rights plaintiffs in their efforts to vindicate rights," and that their work could "also be construed as post-judgment work to ensure continued enforcement of the rights secured in *Hastert*." R.204 at 6.

The district court also noted that the intervenors met the standard for qualifying as a prevailing party because they "contributed to the successes obtained in the case" with efforts that were "nonduplicative of the efforts of the named party." R.204 at 7. In light of the fact that "the intervenors carried the weight of the defense while the State passively awaited the outcome," the court determined that the intervenors were prevailing parties. R.204 at 7. The court held the State responsible for the fee award to the intervenors because it had failed to defend the *Hastert* plan that previously had been held "statutorily and constitutionally mandated." R.204 at 8. The court concluded that, given the State's "explicitly neutral stance" in the case, had the intervenors not entered the litigation, they ultimately would have had to bring "yet another suit" to reinstate the First and Fourth districts, and, in that suit, "they would have been plainly entitled to fees from the defendant State." R.204 at 12. Because of this situation, the court saw no reason not to award fees.

The district court also ruled that Plaintiff Kelly's voluntary dismissal of his challenge to the First District did not preclude recovery on the part of those intervenors with ties to the First District (Rush, Black and Johnson). It determined that the First District intervenors qualified as "prevailing parties" because they had successfully "advocated the preservation of the three majority-African-American districts" against a challenge to the Fourth District which, if successful, could have altered those three districts. R.204 at 13.

On August 23, 2003, the three-judge district court issued an order awarding the intervenors $371,185.00 in fees and $14,252.52 in costs. The State appealed to this court.

## II

## ANALYSIS

### A.  Standard of Review

We review a district court's award of attorneys' fees for an abuse of discretion. *See Jaffee v. Redmond*, 142 F.3d 409, 412 (7th Cir. 1998). That deferential standard is appropriate, given "the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). However, when a district court's decision whether to award fees is based on the application of a legal principle, we conduct de novo review of any "alleged legal errors." *Jaffee*, 142 F.3d at 412-13. Any "factual matters underlying the fee award" (for instance, "the fee amount and a party's ultimate litigation goals") are reviewed for clear error. *Palmetto Props., Inc. v. County of DuPage*, 375 F.3d 542, 547 (7th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 965 (2005).

### B. Statutory Framework

The State contends that the district court's order requiring the State to pay the attorneys' fees of the intervenors is not authorized by federal law. Specifically, the State submits that "there is no explicit statutory authority for ordering a winning party to pay another winning party's attorney's fees." Appellants' Br. at 19. Furthermore, the State contends that, absent the "explicit statutory authority to order a party in whose favor judgment has been entered to pay another party's fees[,] . . . the fee award here must be reversed." *Id.* at 19-20.

The federal courts follow the "American Rule" with respect to attorneys' fees: A federal court normally will not

order one party in a case to pay another party's attorneys' fees unless Congress has authorized such fee awards by statute. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 245, 269 (1975). Congress has provided for fee-shifting in 42 U.S.C. § 1973*l*(e) and § 1988. *See Hastert III*, 28 F.3d at 1437.

Section 1973*l*(e) provides that a court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 42 U.S.C. § 1973*l*(e). Similarly, § 1988, the Civil Rights Attorneys Fees Award Act, authorizes a court, "in its discretion," to award attorneys' fees to the "prevailing party" in "any action or proceeding to enforce" one of a number of civil rights statutes, including 42 U.S.C. § 1983. 42 U.S.C. § 1988. As an initial matter, we point out that the language of these statutes does not preclude defendants or defendant-intervenors from recovering attorneys' fees. The statutes refer to "prevailing parties," not to prevailing plaintiffs. Because the attorneys' fees provision in § 1988 was patterned on § 1973*l*(e), the standard for awarding fees under both provisions is the same. *See Hensley*, 461 U.S. at 433 n.7;[5] *see also Hastert II*, 794 F. Supp. at 258 n.1.

The purpose of § 1973*l*(e) and § 1988 is "to ensure effective access to the judicial process" for persons with civil rights or voting rights grievances. *Hensley*, 461 U.S. at 429 (internal quotations omitted). This court has recognized that, by providing a "reasonable attorneys' fee" to "those who as 'private attorneys general' take it upon *themselves* to invoke and thereby invigorate federal constitutional and statutory

---

[5] The Supreme Court has stated that the standards for awarding fees under § 1988 "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' " *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983).

rights," Congress hoped "to encourage private citizens to initiate court action to correct violations of the Nation's civil rights statutes . . . and . . . to insure that those who violate the Nation's fundamental laws do not proceed with impunity." *Charles v. Daley*, 846 F.2d 1057, 1063 (7th Cir. 1988) (emphasis in original), *cert. denied sub nom. Diamond v. Charles*, 492 U.S. 905 (1989).[6]

The legislative histories of § 1973*l*(e) and § 1988 both reflect Congress' expectation that, in some circumstances, defendants or defendant-intervenors would be prevailing parties entitled to attorneys' fees. The Senate Report on § 1988 notes: "In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff intervenors. However, in the procedural posture of some cases, the parties seeking to enforce such rights may be the defendants and/or defendants intervenors."[7] The Senate Report on § 1973*l*(e) includes almost exactly the same language.[8]

---

[6] *See also* S. Rep. No. 94-295, at 40, 43 n.47 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 807, 810 n.47 (discussing § 1973*l*(e)) ("S. Rep. No. 94-295"); S. Rep. No. 94-1011, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5910 (discussing § 1988) ("S. Rep. No. 94-1011"); *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 416 (1978).

[7] S. Rep. No. 94-1011, at 4 n.8 (citing *Shelley v. Kraemer*, 334 U.S. 1 (1948)). In *Shelley v. Kraemer*, the defendants' constitutional rights were vindicated when defendants prevailed in suits brought by plaintiffs seeking to enforce racially restrictive covenants. 334 U.S. at 23.

[8] The Senate Report on 42 U.S.C. § 1973*l*(e) notes:

In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs . . . . However, in the
(continued...)

"[I]n order to qualify for attorney's fees under [§ 1973*l*(e) and] § 1988, a [party] must be a 'prevailing party.' " *Farrar v. Hobby*, 506 U.S. 103, 109 (1992); *see also Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) ("prevailing party" is "a legal term of art"); *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) ("Congress intended to permit the . . . award of counsel fees only when a party has prevailed on the merits of at least some of his claims."). A prevailing party in an action to vindicate rights protected by statutes such as 42 U.S.C. § 1983 and by the Fourteenth and Fifteenth Amendments " 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' "[9]

## C. Prevailing Parties

The State submits that, because "judgment was entered in its favor," the district court erred in ordering it to pay the intervenors' attorneys' fees. Appellant's Br. at 19. According to the State, "the threshold inquiry for a fee award is who *lost*, not who won." *Id.* at 19 (citing *Kentucky v. Graham*, 473 U.S. 159, 164 (1985)).

However, we think that respect for Congressional decision-making requires that the issue be posed more pre-

---

[8] (...continued)
   procedural posture of some cases (e.g., a declaratory judgment suit under Sec. 5 of the Voting Rights Act) the parties seeking to enforce such rights may be the defendants and/or defendant intervenors.

S. Rep. No. 94-295, at 40 n.42.

[9] S. Rep. No. 94-295, at 40; S. Rep. No. 94-1011, at 5; *see also Hensley*, 461 U.S. 429.

cisely: We must ask whether the intervenors were "prevailing parties" within the scope of § 1973*l*(e) and § 1988. This court has recognized that "section 1988's paramount concern was to fashion the parameters of *eligibility* for fee awards." *Charles*, 846 F.2d at 1064 (emphasis in original). Therefore, as in that case, "the critical distinction for purposes of fixing fee liability in the somewhat atypical circumstances presented in this case is between prevailing and non-prevailing [parties]." *Id.*; *see also Brusco v. United Airlines, Inc.*, 239 F.3d 848, 865 (7th Cir. 2001) (noting that the question of whether a party is a "prevailing party" must be resolved before the "propriety of . . . fee award" can be determined).

The State appears to accept that at least some of the intervenors have prevailed in this litigation; however, it submits that the First District intervenors—those intervenors who are registered voters and residents in the majority-African-American First Congressional District—are not "prevailing parties" because Plaintiffs Kelly and PACMA successfully moved to have their challenge to the First District dismissed without prejudice.

The Supreme Court has adopted a "generous formulation" of the term "prevailing party";[10] parties are said to

---

[10] Although many of the cases to which we refer here describe the requirements in terms of "prevailing plaintiffs," *see, e.g., Hensley*, 461 U.S. at 433, we think the discussion provided by those cases is equally instructive to the inquiry whether any party is a "prevailing party." Therefore, those cases are helpful here, given the unusual alignment of parties in this case, which includes multiple intervening defendants. *Cf. Comm'r's Court of Medina County v. United States*, 683 F.2d 435, 440 & n.5 (D.C. Cir. 1982) ("[N]either [the party's] status as intervenors nor as defendants (continued...)

have prevailed in litigation for "attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433 (internal quotation omitted). The Court has noted that the "touchstone of the prevailing party inquiry" is "the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989). "[A]t a minimum, to be considered a prevailing party . . . [a party] must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 792.

The Court has given guidance as to what will constitute the material alteration required by *Garland*. For instance, in *Farrar*, the Court summarized a number of its earlier decisions: "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, . . . or some comparable relief through a consent decree or settlement." 506 U.S. at 111 (internal citations omitted). A plaintiff may become a prevailing party by obtaining a declaratory judgment. *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Such a judgment "will constitute relief, for purposes of § 1988, if, and only if, it affects the behavior of the defendant toward the plaintiff." *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988). Furthermore, "[w]hatever relief the [party] secures must directly benefit him at the time of the judgment or settle-

---

[10] (...continued)

precludes an award of fees under the Voting Rights Act. . . . Having voluntarily entered the suit, a defendant-intervenor's position can more readily be analogized to that of a plaintiff.").

ment." *Farrar*, 506 U.S. at 111. Ultimately, a party " 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111-12.

On the facts of this case, we must conclude that those intervenors who are registered voters and residents in the Fourth Congressional District are prevailing parties. In the litigation on the merits of this case, the intervenors achieved the benefit they sought when they intervened in the litigation: the preservation of the Fourth District, as drawn in the *Hastert* plan. Furthermore, the judgment of the three-judge district court, which the Supreme Court affirmed, affected the behavior of the defendant Board of Elections towards the Fourth District intervenors; the Board of Elections can no longer profess ambivalence towards the map of the Fourth District. The Fourth District intervenors also benefitted directly from the judgment on the merits in this case because, in future elections, they will continue to vote in a district that was drawn to protect their voting rights.

With respect to the First District intervenors, we conclude that they, too, are prevailing parties entitled to attorneys' fees. The *Hastert* court found that the extraordinary configuration of the majority-Hispanic district adopted in that case was necessary to preserve against retrogression the three districts with African-American majorities. *See Hastert I*, 777 F. Supp. at 662 ("[Section] 2 of the Voting Rights Act warrants the creation of an Hispanic super-majority district, as well as the preservation of the three existing African-American districts. The *Hastert* plan provides these minority communities . . . with a marginally superior opportunity to exercise political control . . . ."). Thus, a challenge to the super-majority-Hispanic Fourth District established in

*Hastert I* also amounts to a challenge to the First District established in that case, as well as the other African-American-majority districts nearby. Defending the map of the Fourth District adopted in the *Hastert* plan meant defending the map of the surrounding majority-African-American districts as well.

As a result of the judgment on the merits, the First Congressional District was preserved. We think it is fair to say that the First District intervenors "accomplished everything [they] set out to achieve." *Hastert III*, 28 F.3d at 1441. Therefore, we conclude that the First District intervenors, as well as the Fourth District intervenors, are "prevailing parties" within the meaning of that term as used in § 1973*l*(e) and § 1988; the district court correctly determined that it could award the intervenors their attorneys' fees in this case.

## D.  Attorneys' Fees

Having concluded that the district court correctly applied the definition of "prevailing party" to the intervenors, we now review the award of fees for abuse of discretion. *See Jaffee*, 142 F.3d at 412.

Although the language of the fee-shifting statutes vests a district court with "discretion" to award attorneys' fees to a prevailing party, this court generally has held that "prevailing civil rights plaintiffs are entitled to their attorneys' fees 'as a matter of course.' " *Hastert III*, 28 F.3d at 1438 (quoting *Entm't Concepts, Inc. III v. Maciejewski*, 631 F.2d 497,

506 (7th Cir. 1980)).[11] The policy considerations behind the fee-shifting statutes clearly support an award of fees to a prevailing plaintiff in a civil rights case: "First, . . . the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority. . . . Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 418 (1978) (internal quotation and citation omitted).

Courts have not established a presumptive rule that a prevailing defendant or defendant-intervenor in a civil rights suit should be awarded attorneys' fees because the "strong equitable considerations counseling an attorney's fee award to a prevailing [civil rights] plaintiff" may not be present when a defendant or an intervening defendant prevails in civil rights litigation. *Id.* In fact, the Supreme Court has limited a prevailing defendant's ability to recover attorneys' fees. In *Christiansburg Garment Co.*, the Court concluded that a "prevailing defendant" in a civil rights suit could not recover his fees and costs from the plaintiff unless there had been a showing "that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421; *see also Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 760 (1989).

**1.**

---

[11] *See also New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68 (1980) ("[T]he court's discretion to deny a fee award to a prevailing plaintiff is narrow.").

We note that several of our sister circuits that have addressed the issue have concluded that prevailing defendant-intervenors are, in some circumstances, entitled to attorneys' fees under fee-shifting statutes. The district court relied on several of these cases in awarding attorneys' fees to the intervenors, and we also find these cases instructive.

**a.**

The District of Columbia Circuit addressed the question of fee awards for intervenors in *Donnell v. United States*, 682 F.2d 240 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1204 (1983). Seven black voters registered in Warren County, Mississippi, intervened on the side of the United States in a suit brought by the Board of Supervisors of Warren County for declaratory judgment approving a new congressional districting plan. *Id.* at 243-44. On appeal from the district court's award of attorneys' fees to the prevailing defendant-intervenors, the District of Columbia Circuit considered whether Congress, in adopting § 1973*l*(e), had provided for prevailing defendant-intervenors to recover attorneys' fees. *Id.* at 246. Because § 1973*l*(e) itself "is silent on the appropriate standard for awarding attorneys' fees to intervenors who participate . . . in a successful suit," the court considered the legislative history of that provision and concluded that Congress had contemplated that "intervenors may be considered as prevailing parties entitled to an award of attorneys' fees." *Id.*

However, the District of Columbia Circuit reasoned that Congress did not "intend[ ] that . . . an award [of attorneys' fees] be as nearly automatic [for defendant-intervenors] as it is for a party prevailing in its own right." *Id.* For instance, "an award of attorneys' fees would be inappropriate . . . if

the intervenor's submissions and arguments were mostly redundant . . . or were otherwise unhelpful." *Id.* at 249. The court recognized a " 'special circumstance' that creates an exception to the ordinary presumption in favor of granting attorneys' fees to a prevailing party . . . [when] a lawsuit is successful, but the intervenor contributed little or nothing of substance in producing that outcome." *Id.* at 247-48. Thus, the court held that "in considering an intervenor's request for attorneys' fees the district court is obligated to examine the particular role played by the intervenor in the lawsuit." *Id.* at 247.

The District of Columbia Circuit also noted that "the critical goal of enabling private citizens to serve as 'private attorneys general' . . . is far less compelling when" an intervenor participates on the side of the United States and "the actual Attorney General . . . defends a suit . . . on behalf of those whose rights are affected." *Id.* at 246. The court set forth the following guidelines for determining when a fee award to an intervening party will be appropriate in circumstances such as those presented by *Donnell*:

> Where Congress has charged a governmental entity to enforce a statutory provision, and the entity successfully does so, an intervenor should be awarded attorneys' fees only if it contributed substantially to the success of the litigation. This inquiry primarily entails determining whether the governmental litigant adequately represented the intervenors' interests by diligently defending the suit. It also entails considering both whether the intervenors proposed different theories and arguments . . . and whether the work . . . performed was of important value to the court.

*Id.* at 248-49.

The District of Columbia Circuit found that there was no "divergence . . . between [the] defendant and [the]

defendant intervenor" that would allow it to conclude that the intervenors' role "differed from that of the Justice Department," and it denied fees to the intervenors. *Id.* at 246-47.

**b.**

The Third Circuit addressed the issue of attorneys' fees for prevailing defendant-intervenors in *Commonwealth v. Flaherty*, 40 F.3d 57 (3d Cir. 1994). A preliminary injunction, entered in 1975 following a successful suit by the Commonwealth of Pennsylvania against the City of Pittsburgh, had required the City's Police Department to practice affirmative action based on race and gender in its hiring decisions. *Id.* at 59. In *Flaherty*, white males applying to the Police Department sued, "challenging the hiring system imposed by the preliminary injunction," and were aligned as "intervening defendants to the original suit between the Commonwealth and the City." *Id.* at 60.

Although the white male applicants succeeded in having the injunction dissolved, the Third Circuit reversed the award of attorneys' fees to prevailing defendant-intervenors. According to the district court's award, 75% of the fee was to have been paid by the Commonwealth of Pennsylvania, the plaintiff in the original proceedings. *Id.* The Third Circuit reasoned that, although it was possible for an intervening defendant to be a "prevailing party" for the purpose of attorneys' fees under § 1988, it was "unprecedented" to require the original plaintiff, the Commonwealth, to pay such a large portion of the intervenors' attorneys' fees. *Id.* at 61-62.

The Third Circuit rejected the district court's reasoning that "it would be proper to . . . treat the Commonwealth as a defendant for fee award purposes because it would further

the congressional goal of attacking discrimination by encouraging civil rights lawsuits." *Id.* at 61. In fact, the Third Circuit stated that "[t]he status of the Commonwealth as a plaintiff seeking a civil rights remedy was not diminished" in this case by its failure to seek a permanent injunction after the preliminary injunction had been granted. *Id.* The Third Circuit concluded, based on *Christiansburg Garment Co.*, that a prevailing defendant may only recover fees "against a plaintiff in a civil rights suit where plaintiff's suit is frivolous, unreasonable, or ground-less." *Id.* at 62. However, the court suggested that it would have upheld an award "order[ing] the [original defendant] City of Pittsburgh to pay 100% of the attorney's fees," because such an award would serve the "dual purposes of encouraging civil rights litigation by intervenors yet not chilling a plaintiff from filing suit." *Id.*

c.

In *Wilder v. Bernstein*, 965 F.2d 1196 (2d Cir.) (en banc), *cert. denied sub nom. Administrator, New York City Department of Human Resources v. Abbott House*, 506 U.S. 954 (1992), a group of nineteen private child care agencies, intervenors in a suit brought against New York City and the officials responsible for the city's child care system, sought attorneys' fees for their work. Because of the unusual posture of the case, "[t]he customary terms of either 'plaintiff-intervenor' or 'defendant-intervenor' were not used" to refer to the intervening child care agencies. *Id.* at 1200.

Reversing the district court's award of attorneys' fees to the intervening agencies, the Second Circuit noted that "[t]o forbid the shifting of attorneys' fees to intervenors, who could otherwise bring a separate action later as plaintiffs alleging the same civil rights violations . . . defeats the goal of judicial economy." *Id.* at 1202. Furthermore, the court

stated, in some circumstances, "intervenors may act effectively as private attorneys general in vindicating abuses of civil rights." *Id.* at 1204. The court reasoned that many "would be intervenors" would find the right to intervene in civil rights suits "hollow . . . were the recovery of attorney's fees not to exist as an incentive." *Id.*

The Second Circuit recognized that Congress had intended intervenors to be able to obtain attorneys' fees in some circumstances. *Id.* at 1205. However, the court reasoned:

> The plaintiffs in a civil rights action have the priority claim for an award of fees as prevailing parties where their efforts have effectuated some or all of the civil rights involved in the litigation. The policies underlying private attorneys general and intervention are not so compelling when a suit has already been initiated and the potential intervenor's interests are adequately represented.

*Id.* The Second Circuit remanded the case for a determination of the extent to which the intervenors' efforts had been either duplicative of those of the original parties or unrelated to the civil rights claims raised in the case. *Id.* at 1206.

### d.

The Fifth Circuit addressed similar circumstances in *League of United Latin American Citizens Council, No. 4434 v. Clements* ("*LULAC*"), 923 F.2d 365 (5th Cir. 1991) (en banc). The League of United Latin American Citizens ("LULAC") had sued the State of Texas, through its officials, on the theory that the method of electing state district judges diluted the votes of minorities, thus violating the Constitution and federal law. *Id.* at 367. Sharolyn Wood, a

sitting state judge elected under the challenged system, intervened on the side of the State, which ultimately prevailed.

Addressing Judge Wood's petition for attorneys' fees, the Fifth Circuit noted that it would not apply its standard for fee awards to "prevailing plaintiffs" to her as a prevailing defendant. *Id.* at 368. Furthermore, the court "decline[d] Judge Wood's invitation to . . . distinguish defendant-intervenors from defendants." *Id.* The case was not one in which "equity could persuade [the court] to look beyond the procedural posture of a case to a party's actual role." *Id.* In fact, the court described Judge Wood as having "participated in all ways as one defending against a civil rights claim and not as one seeking to establish and rectify a violation of civil rights." *Id.* Because Judge Wood was an intervening defendant, the court reasoned, her "right to recover attorneys' fees [under § 1973*l*(e) and § 1988] cannot rise above what it would have been had she originally been joined as . . . a defendant." *Id.* at 369. Thus, in order to determine whether Judge Wood, as an intervening defendant, was entitled to attorneys' fees from the plaintiffs, the court would have considered whether the plaintiffs' action was "frivolous, unreasonable, or without foundation." *Id.* at 368 (citing *Christiansburg Garment Co.*, 434 U.S. at 417-21).

However, rather than seeking fees from the plaintiffs, Judge Wood sought fees against the named defendant, the State of Texas, on the grounds that the "Texas attorney general could not have won the case without her and that he did not adequately defend her interests or perform his official duties." *LULAC*, 932 F.2d at 369. The Fifth Circuit held that, because the duties of the Texas attorney general were set by state and not federal law, Judge Wood's claims did not "fall under the Civil Rights Act or the Voting Rights

Act." *Id.* Therefore, she could not recover fees under § 1973*l*(e) and § 1988, the attorneys' fees provisions related to those statutes.

### 2.

In light of the considerations raised by our sister circuits, as well as the plain language and legislative history of the fee-shifting provisions at issue here, we must conclude that the intervenors are entitled to attorneys' fees.

Due to the unusual procedural history of this case, we think it simply is not realistic to view the intervenors as defendants opposing a civil rights claim. Unlike the intervening defendant in *LULAC*, who "participated in all ways as one defending against a civil rights claim and not as one seeking to establish and rectify a violation of civil rights," *id.* at 368, the intervenors' position can be analogized to that of co-plaintiffs asserting their own rights, especially given their involvement in the *Hastert* litigation.

The State submits that the intervenors should not be "re-align[ed] . . . as plaintiffs" in this voting rights case simply because they are members of "minority group[s]." Appellant's Rep. Br. at 17-18. We agree. The intervenors' race is not operative in our analysis; what matters is that they successfully protected rights guaranteed to them under the Constitution of the United States and the Voting Rights Act. It is for this reason that we think their position in this case can be analogized to that of traditional civil rights plaintiffs.[12]

---

[12] The district court did not "realign[ ] [Intervenors] as plaintiffs and then award[ ] them fees" as the State contends. Appellant's

(continued...)

Awarding attorneys' fees to the intervenors promotes the underlying goals of the fee-shifting statutes. The efforts of the intervenors furthered the rights that Congress sought to protect in the civil rights statutes. *See Wilder*, 965 F.2d at 1205 ("[W]hen . . . intervenors effectuate the civil rights at issue they are entitled to an award because such a result furthers the civil rights statutes in a fashion envisioned by Congress.").

We agree, however, with the District of Columbia Circuit's statement in *Donnell* that Congress did not "intend[ ] that . . . an award [of attorneys' fees] be as nearly automatic [for defendant-intervenors] as it is for a party prevailing in its own right." 682 F.2d at 246. Like our sister circuits, we think that it is appropriate to ask whether the efforts of an intervenor were duplicative of those of the named defendant in a case. *See id.* at 249 ("[A]n award of attorneys' fees would be inappropriate . . . if the intervenor's submissions and arguments were mostly redundant of the Government's or were otherwise unhelpful."); *see also Wilder*, 965 F.2d at 1205. However, we think the intervenors' efforts were not duplicative of the State's efforts in any way in this case. The district court's findings that "the intervenors carried the weight of the defense while the State passively awaited the outcome," R.204 at 7, are supported amply by the record.[13]

---

[12] (...continued)

Rep. Br. at 17. There is no reason to require that a party be a plaintiff to receive an award of attorneys' fees under either § 1973*l*(e) or § 1988; the dispositive question is whether the party *prevailed*.

[13] We shall address below the State's contention that the participation of the Attorney General in this case made the intervenors' (continued...)

We also see no impediment in awarding fees to the intervenors simply because they were aligned as intervening defendants in this case. The general prohibition, announced in *Christiansburg Garment Co.*, which purports to prevent prevailing civil rights defendants from obtaining fees unless "the plaintiff's action was frivolous, unreasonable, or without foundation," 434 U.S. at 421, was announced in a context in which a prevailing defendant sought fees from a civil rights plaintiff. Indeed, in a subsequent case, the Supreme Court noted the limitations on the rule from *Christiansburg Garment Co. See Zipes*, 491 U.S. at 760 (concluding that *Christiansburg Garment Co.* controls whether the "prevailing defendant could be awarded fees . . . against the plaintiff").

The role that the intervenors played in this litigation cannot be assessed in a vacuum. It must be viewed in relation to the earlier *Hastert* litigation. In that context, it is clear that the defendant-intervenors simply were protecting the earlier adjudication of their rights. The Supreme Court has held that prevailing plaintiffs are entitled to "[p]rotect[ ] . . . the full scope of relief" awarded to them. *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 559 (1986) ("[P]ostjudgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee."). Our cases make clear that, absent some authorization in the initial judgment itself to monitor compliance, parties who seek to protect a previous victory still must prevail in the action or proceeding brought to pro-

---

[13] (...continued)
efforts duplicative and, therefore, constituted a "special circumstance" that should prevent the intervenors from recovering fees and costs.

tect the victory in order to be entitled to attorneys' fees.[14] Certainly, having prevailed on their civil rights claims in the *Hastert* litigation, the intervenors were entitled to defend the fruits of that litigation, the *Hastert* plan. "Intervention that is in good faith is by definition . . . a means . . . of protecting legal rights . . . ." *Zipes*, 491 U.S. at 765. Now they are entitled to attorneys' fees for their successful defense of the *Hastert* plan.

Finally, awarding attorneys' fees to the intervenors promotes judicial efficiency. Parties such as the intervenors should be encouraged to intervene in suits such as this one, rather than bringing their own claims in subsequent suits. If, instead of intervening here, the intervenors had brought, and prevailed in, a separate action to force the State to use the *Hastert* plan, then certainly they would be eligible for an award of attorneys' fees. *See Hastert III*, 28 F.3d at 1443.[15] A

---

[14] *See, e.g., Alliance to End Repression v. City of Chicago*, 356 F.3d 767, 769 (7th Cir. 2004) (noting that this court has held that "plaintiff, having won a judgment in the district court, 'had no choice' but to incur attorneys' fees to defend the judgment . . . [b]ut in that case, . . . the plaintiff was successful . . . enough to make him the prevailing party," and that, "[h]ad he lost on appeal he would not have been entitled to any award of fees" (quoting *Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir. 1988))).

[15] See also *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 764-65 (1989). In *Zipes*, the Supreme Court asked whether attorneys' fees should be recoverable from intervening defendants. The Court considered whether a fee award would have been available had the intervenors in the case mounted a separate collateral attack, rather than intervening. The Court reasoned that "establishing . . . one-way fee liability . . . would foster piecemeal litigation of complex civil rights controversies—a result that is strongly disfavored." 491 U.S. at 764.

regime under which interested parties have incentives to bypass the opportunity to intervene in suits such as the one at issue here and, instead, vindicate their rights as plaintiffs, to whom attorneys' fees are presumptively available, would indeed be wasteful. As the Supreme Court noted in *Zipes*, such a regime "would encourage interested parties to await the entry of judgment and collaterally attack remedial schemes. This would serve the interests of no one . . . ." *Zipes*, 491 U.S. at 764-65.

Thus, in light of the facts of this case, we conclude that the intervenors are prevailing parties entitled to reasonable attorneys' fees under § 1973*l*(e) and § 1988.

## D.  Source of the Fee Award

The State also submits that it is not the proper party against whom to assess the intervenors' attorneys' fees. We previously have noted that the fee-shifting statutes "do not specify with particularity those who may be called upon to shoulder . . . fee awards." *Charles*, 846 F.2d at 1063 (citing *Graham*, 473 U.S. at 164). The State argues that it is relieved from liability for attorneys' fees in this case by the Supreme Court's statement in *Kentucky v. Graham* that "the logical place to look for recovery of fees is to the losing party—the party legally responsible for relief on the merits." 473 U.S. at 164. Therefore, the State contends that assessing attorneys' fees against it is "simply not logical" because it claims to be a winning party. Appellant's Br. at 19.

In *Graham*, "[t]he question presented [was] whether 42 U.S.C. § 1988 allows attorney's fees to be recovered from a governmental entity when a plaintiff sues governmental employees only in their personal capacity and prevails." 473 U.S. at 161. Specifically, the Court addressed the question of whether, in a suit from which the Commonwealth of

Kentucky enjoyed Eleventh Amendment immunity, the Commonwealth nonetheless could be held responsible for a prevailing plaintiff's attorneys' fees. *Id.* at 172.[16]

This court already has "decline[d] to read *Graham* as standing for a holding broader than the Court's own stated intention in deciding the case." *Charles*, 846 F.2d at 1068. In fact, we have noted that "*Graham* merely explores the narrow issue of a government entity's liability for section 1988 fees when a prevailing civil rights plaintiff, as a result of the operation of the Eleventh Amendment, has successfully sued state officials but only in their personal capacity." *Id.* We shall not read *Graham* as broadly as the State of Illinois encourages; for this reason, we think *Graham*'s statement that "the losing party" is "the logical place to look for re-

---

[16] In *Graham*, the plaintiffs brought a civil rights suit seeking *only damages* and named the Commonwealth of Kentucky as one defendant in the suit. 473 U.S. at 161-62. After the Commonwealth had been dismissed from the suit on Eleventh Amendment grounds and after the plaintiffs had entered into a settlement agreement with the other defendants that barred them from seeking attorneys' fees from those defendants, the plaintiffs attempted to obtain attorneys' fees from the Commonwealth. The Court determined that attorneys' fees could not be assessed against a state in such a suit, which, for Eleventh Amendment purposes, only could be brought against a state official in his personal capacity. *Id.* at 171. In directing the plaintiffs in *Graham* to look to a losing party for attorneys' fees, the Court emphasized its holding that there is no "fee liability where merits liability is nonexistent." *Id.* at 168. The Court wrote that "[o]nly in an official-capacity action is a plaintiff who prevails entitled to look for relief, both on the merits and for fees, to the governmental entity." *Id.* at 171. In this case, the State contends neither that it is immune from suit nor that it is immune from having an attorneys' fee award assessed against it.

covery of fees" is not instructive for the purposes of this case. *Graham*, 473 U.S. at 164.

The State also contends that fees and costs must not be assessed against one "winning" defendant and in favor of another "winning" defendant. Appellant's Br. at 19. Although the Court in *Graham* also stated that, "where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 [and § 1973*l*(e)] do[ ] not authorize a fee award against that defendant," 473 U.S. at 165, as we explained above, we do not think that holding "is properly applicable to cases, such as this one, that are factually, and in other material respects, distinguishable," *Charles*, 846 F.2d at 1067.

We have recognized that "the test for a prevailing party must be one that does not exalt form over substance." *Id.* at 1065. Therefore, the fact that the party suing the State did not prevail on the merits of this litigation does not mean that the State is a prevailing party, especially in light of the State's failure to defend the *Hastert* plan. The district court found that "the State's explicitly neutral stance regarding the disposition of this case makes it difficult for the court to deem them the 'prevailing party.' Notwithstanding the determination of the formal judgment, the posture adopted by the state does not satisfy the standard for a prevailing party." R.204 at 12. We agree with the district court's characterization of the State's activity in this case. In fact, we believe that, when the State has failed to defend actively against a voting rights claim as the State did here, the State cannot be said to have prevailed in the litigation in the manner required by the fee-shifting statutes. When we consider whether a "material alteration of the legal relationship of the parties," as described by the Supreme Court, occurred here, we must conclude that the State did not prevail over the plaintiff in this case. *Garland*, 489 U.S. at 792-93. Rather,

the district court rejected the State's ambivalent position toward the *Hastert* plan, and the Supreme Court affirmed.

Furthermore, this court already has found that "nothing in the express language of section 1988 or in its legislative history nor pertinent case law conclusively link[s] a party's liability for substantive relief with liability for fees." *Charles*, 846 F.2d at 1070. This court already has rejected the position that "a party's liability for relief is an absolute prerequisite to liability for section 1988 fees." *Id.* at 1066 n.13. Therefore, the fact that the map maintained by the State was not declared unconstitutional in the litigation on the merits "does not *require* that [the State] be immune from fee liability pursuant to section 1988." *Id.* at 1070 (emphasis in original).

Therefore, despite the State's arguments to the contrary, we think that it is entirely logical to assess attorneys' fees against the State in this case, particularly since all other potential sources of the intervenors' attorneys' fees have been foreclosed by the decisions of the Supreme Court. For instance, we shall not assess the fee award against the plaintiffs in this case. It remains the rule that a prevailing party may recover attorneys' fees from a civil rights plaintiff only when the plaintiff's suit proves to be "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."[17] *Christiansburg Garment Co.*, 434 U.S. at 421; *see also Flaherty*, 40 F.3d at 62. Assessing attorneys' fees against the plaintiffs in this case would work precisely the harm the Supreme Court warned about in

---

[17] Indeed, the State does not allege that the plaintiffs' litigation was "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co.*, 434 U.S. at 421.

*Christiansburg Garment Co.*: Future civil rights plaintiffs would be deterred from bringing potentially meritorious claims, out of the fear that they would have to pay a defendant's legal fees if they could not establish their claim.[18]

However, to require the intervenors to pay their own attorneys' fees and costs also would frustrate the purposes of the voting rights provisions at issue here. This case presents the unique circumstances which Congress anticipated when it enacted § 1973*l*(e) and § 1988: A defendant-intervenor is the party vindicating rights guaranteed by the United States Constitution and federal voting rights laws.[19]

Because the intervenors were vindicating their civil rights, we think that the appropriate party from whom to seek fees in this case is indeed the State. Certainly, fee awards may issue against state and local governments. *Hutto v. Finney*, 437 U.S. 678, 694 (1978). Regardless of whether the State is the "losing" party, it is the party "legally responsible for relief." *Graham*, 473 U.S. at 164. The Constitution and the Voting Rights Act impose a responsibility upon the State to conduct congressional elections, U.S. Const. art. I, § 4, cl. 1, and forbid the State from abridging or denying the right to vote on account of race or color, U.S. Const. amend. XV, cl. 1, or on account of membership in a language minority

---

[18] *See Christiansburg Garment Co.*, 434 U.S. at 422 ("To take the further step of assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of [civil rights laws]."); *see also* S. Rep. No. 94-1011, at 5 (parties "seeking to enforce the rights" protected by civil rights legislation function as "private attorneys general" and "should not be deterred from . . . vindicat[ing] . . . fundamental rights . . . by the prospect of having to pay their opponent's counsel fees should they lose").

[19] *See* S. Rep. No. 94-1011, at 4 n.8; S. Rep. No. 94-295, at 40 n.42.

group, 42 U.S.C. §§ 1973 & 1973b(f)(2). Thus, the Illinois State Board of Elections is responsible for the relief requested by *both* the plaintiff and the intervenors in this case: to have congressional elections conducted in accordance with the United States Constitution and federal law governing elections.

As this court held in *Hastert III*, it is appropriate to assess an attorneys' fee award against the Board of Elections here, where "the political branches . . . fail[ed] to vindicate important rights." 28 F.3d at 1444. That is what happened when the Board of Elections failed to defend the *Hastert* plan. We noted in *Hastert III* that, whether a congressional districting map is arrived at through the "legislative . . . process that typically attends congressional redistricting" or through "the federal judicial arena," the State is responsible for adopting an appropriate congressional districting plan. *Id.* at 1443 (internal quotations omitted). The State cannot escape the costs of creating and maintaining that plan by failing to take an active role in redistricting litigation, thereby forcing individuals like the intervenors to bear the cost of protecting their rights. For these reasons, we conclude that the district court appropriately assessed attorneys' fees against the State.

### E.  Special Circumstances

Finally, we turn to the question of whether so-called "special circumstances" should prevent the award of attorneys' fees. We have recognized that a court's decision whether to award attorneys' fees, although "commit[ted] . . . to a district court's discretion" by statute, "is . . . quite narrow once prevailing party status has been determined." *Id.* at 1443 (citing *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68 (1980)). Nonetheless, we shall address the State's conten-

tion that "special circumstances" should preclude an attorneys' fee award in this case. Appellants' Br. at 33. The State submits, for the first time on this appeal, that the participation of the Attorney General of the United States in this case constitutes a special circumstance that should prevent the intervenors from recovering their fees in this case. The intervenors contend that the State waived this argument by not presenting it below and that, in the alternative, the State's argument fails on the merits. Based on the facts of this case, we must agree with the intervenors.

"[I]ssues not raised below are waived on appeal." *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997). To determine whether an argument has been waived, "we must take [a party's] case as [he] presented it to the district court." *Id.* The State filed both a motion in opposition to the intervenors' petition for attorneys' fees and costs, in which it objected to the designation of the intervenors as prevailing parties entitled to fees and costs, and a motion responding to the intervenors' supplemental petition for attorneys' fees and costs, in which it also objected to the amount of fees and costs which the intervenors had requested. In neither of these filings did the State contend that the work done by the United States, through the Attorney General and the Department of Justice, made it inappropriate to award attorneys' fees to the intervenors.

However, even if the State had not waived this argument, it would not be a convincing one. This court never has considered whether *intervention* by the United States as a defendant constitutes a "special circumstance" which should preclude an award to another defendant-intervenor. In these circumstances, we find guidance in the opinions of our sister circuits that have considered similar questions.

The concerns expressed by the District of Columbia Circuit in *Donnell*, 692 F.2d at 244, and by the Second Circuit in

*Wilder*, 965 F.2d at 1205, inform our conclusion that there are no "special circumstances" here, despite the presence of the United States as an intervenor. There is a meaningful difference between the situation in *Donnell*, in which the District of Columbia Circuit denied the intervenors' fees, and the facts of this case. In *Donnell*, the plaintiffs' suit was brought against the United States and the United States actively defended against the suit from the start. *See* 692 F.2d at 244. In this case, on the other hand, the State, which was named as a defendant in this case, took the position that it was not "incumbent" upon it to defend the congressional districting map adopted after *Hastert*. R.144, Ex.18 at 3. Obviously, the intervenors' efforts were not redundant of the efforts of the named defendant, because the State had no intention of representing the intervenors' interests as the victors in an antecedent voting rights suit.

In this case, unlike the situation presented in *Wilder*, there was no party "adequately represent[ing]" the intervenors' interests before they intervened. *Wilder*, 965 F.2d at 1205. In *Wilder*, the Second Circuit questioned whether the interests of the intervenors already were protected adequately by other litigants at the time the intervenors entered the case. *Id.* When the intervenors in this case sought leave to intervene, however, the United States had not yet entered the case. As a result, at the time they intervened, the intervenors were not seeking to ride the coattails of a governmental entity already engaged in defending the suit. In fact, we think the intervenors clearly were effectuating the "policies underlying private attorneys general and intervention" when they intervened. *Id.*

The subsequent intervention of the United States as a defendant-intervenor in this case does not change our conclusion. We are not convinced that the intervenors' efforts were so duplicative of those of the Department of Justice

that the intervenors did not contribute materially to the outcome of the case. In particular, we are mindful of a statement made by the district court on the merits in *Hastert I*. Although the court ultimately adopted the *Hastert* plan, it noted that both the *Hastert* and *Rosebrook* plans "would have passed constitutional and legal muster had either plan been the product of the state legislative process." *See Hastert I*, 777 F. Supp. at 662. This statement lends some support to the view that some constitutional alternative to the *Hastert* plan might have been adopted in this case, had the intervenors not taken part in the litigation. Therefore, we think that the presence of the intervenors was important to the specific outcome in this case, that is, the maintenance of the *Hastert* plan for Illinois' congressional districts.

We also note that district courts are best situated to determine whether a prevailing intervenor's participation was so unimportant that the intervenor does not deserve an award of attorneys' fees.[20] In this case, the district court witnessed the way the parties conducted litigation firsthand and determined that "the intervenors carried the weight of the defense while the State passively awaited the outcome." R.204 at 7. The district court also stated that "the intervenors can rightly claim the victory had in *King* as hard-won fruit of their labor." *Id.* We shall not disturb that finding. Therefore, we conclude that the participation of the United States in this case does not constitute a "special circumstance" that precludes the award of attorneys' fees to the intervenors.

---

[20] *See also Wilder v. Bernstein*, 965 F.2d 1196, 1205 (2d Cir. 1992) (en banc) ("Any adjustment in the fee award based upon the extent to which a party's participation contributed to the ultimate remedy, including considerations of duplication and motivations other than civil rights, rests appropriately in the district court's sound discretion.").

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*