**Dorothy GAUTREAUX, et al.,
Plaintiffs–Appellees,**

v.

**CHICAGO HOUSING AUTHORITY, a corporation, and Joseph Shuldiner, Executive Director, in his official capacity, Defendants–Appellants.**

Nos. 98–1807, 98–2311 and 98–3145.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1998.

Decided May 28, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 22, 1999.*

---

* Judge Cummings participated in the consideration of this case but died before the decision was rendered. Circuit Judges Joel M. Flaum and Frank H. Easterbrook did not participate in the consideration of this petition for rehearing *en banc*.

Michael L. Shakman, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Alexander Polikoff (argued), Chicago, IL, for Plaintiffs–Appellees in Nos. 98–1807 and 98–2311.

Alexander Polikoff (argued), Chicago, IL, for Plaintiffs–Appellees in No. 98–3145.

Susan Getzendanner (argued), Nancy S. Eisenhauer, Skadden, Arps, Slate, Meagher & Flom, Jerome Butler, Chicago, IL, for Defendant–Appellants Chicago Housing Authority and Joseph Shuldiner.

Barry A. Miller (argued), Michael L. Shakman, Edward W. Feldman, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL, for Appellees Daniel E. Levin and Habitat Company.

Before CUMMINGS,** KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

When the time comes to write the story of public housing in the United States, the thirty-plus year saga of this litigation and the experience of the City of Chicago will surely feature prominently. The case began in 1966, when Dorothy Gautreaux and others filed a class action claiming that the Chicago Housing Authority ("CHA") had intentionally perpetuated racial segregation both in its tenant assignment practices and in its siting policies. In 1969, the district court found for the plaintiff class, *Gautreaux v. Chicago Housing Auth.*, 296 F.Supp. 907 (N.D.Ill.1969) (*Gautreaux I*), and entered a remedial decree designed to address the constitutional violations, *Gautreaux v. Chicago Housing Auth.*, 304 F.Supp. 736 (N.D.Ill.1969) (*Gautreaux II*). That decree has continued in force ever since. The CHA has now appealed to this court from three orders the district court entered in 1998 in the course of supervising the decree. We conclude that these orders are essentially interlocutory in nature, that we lack jurisdiction over the appeal, and that it therefore must be dismissed.

**I**

In order to understand why we lack jurisdiction over this appeal, it is necessary to summarize briefly the history of this litigation. Prior to the entry of the 1969 decree, the Gautreaux class showed that the CHA had effectively designated four

** Judge Cummings participated in the consideration of this case but died before the decision was rendered.

housing projects, built in majority-white Chicago neighborhoods, as "white," and that it had reserved the remainder of its facilities for non-whites. Using a discriminatory pre-clearance procedure and quotas, the CHA restricted the number of African–American families it assigned to the four "white" family housing projects. As a result, despite the fact that 90% of the families on the CHA's waiting list were African–American, African–Americans comprised less than 10% of the families in those four projects. The picture was the opposite in the other projects: there, the tenants were (as of 1969) 99% African–American, and 99.5% of the units were located in neighborhoods that were majority African–American.

## A. The 1969 Injunction and the 1987 Receivership Order

The *Gautreaux II* injunction divided Cook County into "Limited Areas," in which 30% or more of the population was African–American, and the "General Area," which was the rest of the county. Initially, it required the CHA to build three dwelling units in the General Area for every one unit it constructed in the Limited Areas; later, that ratio was changed to one-to-one. The injunction defined a dwelling unit as a residential unit "which is to be initially made available to and occupied by a low-income, non-elderly family, subsequent to the date [of the injunction], directly or indirectly by or through CHA...." *Gautreaux II*, 304 F.Supp. at 737. More generally, the injunction required that the CHA "affirmatively administer its public housing system in every respect (whether or not covered by specific provision of this judgment order) to the end of disestablishing the segregated public housing system which has resulted from CHA's unconstitutional site selection and tenant assignment procedures." *Id.* at 741. The idea was to bring about a gradual cure of the CHA's constitutional violations over time, as the CHA made new units available to public housing residents. The injunction is still in place,

and, of critical importance to our decision, the CHA has requested neither its modification nor its termination.

For the next 18 years, the district court patiently waited in vain for the CHA to develop what has become known as "scattered site housing." In 1987, it finally appointed a receiver (Daniel E. Levin and The Habitat Company), to whom it assigned the responsibility for developing scattered site housing on the CHA's behalf. *Gautreaux v. Pierce*, Order of Aug. 14, 1987. The receivership order applies both to housing projects that were underway at the time and to "all CHA non-elderly public housing development programs which may in the future be authorized by HUD during the pendency of [the case against the CHA]." *Id.* at 2. The receiver is authorized to exercise

> all powers of CHA respecting the scattered site program necessary and incident to the development and administration of such program, including: (a) Making all determinations governing the scattered site program in compliance with prior and future orders of this Court, including without limitation (1) submission to HUD of applications for funding, development programs and other documents....

*Id.* at 2–3. The receivership order also directs the CHA to give the receiver its full cooperation. As with the injunction, the CHA has not asked that the receivership order be modified or terminated, and it remains in effect.

## B. The Current Controversy

In 1992, Congress passed a new public housing funding program called HOPE VI, an acronym for "Homeownership and Opportunity for People Everywhere." 42 U.S.C. § 1437*l* (note). The program seeks to revitalize severely distressed or obsolete public housing developments by funding a mixture of local public housing authority activities on a competitive grant basis. Local public housing authorities may use

HOPE VI grant monies for a variety of purposes, including, among other things, planning revitalization projects, demolition, renovation, providing Section 8 rent vouchers, social services, and (of greatest interest here) building replacement dwellings. To the extent that obsolete public housing is eliminated through HOPE VI, replacement units can be made available through a combination of Section 8 vouchers, new construction, renovation, and other acquisitions. Under HOPE VI, any *demolished* housing units must "be located in up to 3 separately defined areas containing the community's most severely distressed projects." *Id.* It does not similarly restrict the locations in which *replacement* units may be built. *Id.*

In 1993, the CHA prepared the first of several funding proposals it has submitted to HUD under the HOPE VI program. It took this step unilaterally—that is to say, without any input from the receiver. In the application, however, it represented to HUD that the location of any replacement units would comply with the locational requirements of the *Gautreaux* injunction. The proposal was successful: HUD awarded it $50,000,000 for the Cabrini–Green Redevelopment Project. When the receiver learned of the existence of the application, it approached the CHA and asked to become involved in the HOPE VI projects, insofar as they would implicate the receiver's authority over the construction of replacement housing. The discussions that followed did not resolve this question definitively. Instead, the CHA was inconsistent in later grant applications. In 1996, it received one grant for the rehabilitation of its ABLA and Henry Horner developments on the basis of a proposal prepared in concert with the receiver, but in the same year it received another grant for the Robert Taylor Homes on the basis of a proposal it prepared independently (after erroneously advising the receiver that no replacement units would be involved).

This spotty cooperation between the CHA and the receiver turned to outright

hostility sometime in late 1996. In September 1997, the CHA filed an emergency motion with the district court, asking it for an order clarifying that the 1969 injunction did not extend to any aspect of the HOPE VI program. In February 1998 (the "February order"), the district court instead held that the portion of HOPE VI funds dedicated to the construction of dwelling units fell squarely within the plain language of the injunction, and that any replacement units were therefore subject to the injunction's locational requirements.

Despite this order, the CHA continued to refuse to cooperate with the receiver or to release the information necessary to allow the receiver to play a role in the HOPE VI grant application due June 29, 1998. In May 1998, the receiver accordingly asked the court to compel the CHA's cooperation. The court granted this motion (the "May order"), explaining that since "HOPE VI is a 'non-elderly public housing development program[ ] ... authorized during the pendency of' the *Gautreaux* litigation, ... it therefore fits entirely within the Receiver's jurisdiction."

Finally, in August 1998, the receiver filed a second emergency motion to compel the CHA's cooperation with the 1987 receivership order and the district court's February and May orders. It took this action after it learned through a news report that the CHA had unilaterally negotiated a settlement with Cabrini–Green residents who had brought a lawsuit against the CHA, see *Cabrini–Green Local Advisory Council v. Chicago Housing Auth.*, 1997 WL 31002 (N.D.Ill. Jan. 22, 1997), and that this settlement would involve the construction of dwelling units. In its "August order," the district court held that the CHA was "hereby enjoined from developing or negotiating or otherwise pursuing any agreement with any person or entity regarding the development of dwelling units (a term defined in the original injunction in this case) without the full participation of the Receiver unless, of course, it has already secured a

waiver [from the injunction] for the contemplated development." That order also instructed the CHA to "return to the drawing board" and renegotiate with Cabrini–Green LAC and the receiver. It therefore effectively prevents the CHA from presenting the deal it had already sealed without the receiver's participation to the judge presiding in the *Cabrini–Green* case.

The CHA appeals from each of these three 1998 orders. A motions panel of this court denied the CHA's motion to stay the February and May orders on May 29, 1998, and reserved for the consideration of the merits panel the motion of the *Gautreaux* plaintiffs to dismiss the appeals for lack of appellate jurisdiction.

## II

The CHA argues that this court has appellate jurisdiction over the February order both because (1) it sets forth the steps the CHA must take to comply with the injunction and is, according to the CHA, therefore a final judgment within the meaning of 28 U.S.C. § 1291; and (2) it is a modification of an injunction, making it an appealable interlocutory order under 28 U.S.C. § 1292(a)(1). The May order, it claims, is within our pendent appellate jurisdiction. Finally, it argues that the August order is a new injunction, appealable independently under § 1292(a)(1).

Though they dispute our independent jurisdiction over the February and May orders, the *Gautreaux* class and the receiver [1] now take the position—agreeing with the CHA—that we have jurisdiction over the August order. As they explained at oral argument, they too regard the August order as a fresh injunction, because it keeps the CHA from presenting the *Cabrini–Green* settlement to another judge of the district court (the Hon. David Coar) for approval. To allow us to reach the

merits of this appeal, they next contend that the August order is "inextricably intertwined" with the February and May orders, thereby bringing those two earlier orders within our pendent appellate jurisdiction. The agreement of the parties with respect to our jurisdiction does not, of course, resolve the matter. E.g., *United States v. County of Cook*, 167 F.3d 381, 387 (7th Cir.1999). We therefore proceed to consider the jurisdictional basis for each of the three orders involved in this appeal.

### A. The February Order

#### 1. Section 1291 Jurisdiction

■ The February order does not dispose of all claims as to all parties. Normally, that fact alone would demonstrate that it does not qualify as a final judgment for purposes of 28 U.S.C. § 1291. *E.g., United States v. Davenport*, 106 F.3d 1333, 1335 (7th Cir.1997). Recognizing its problem, the CHA seeks to rely on this court's decision in *Association of Community Organizations for Reform Now (ACORN) v. Illinois State Board of Elections*, 75 F.3d 304 (7th Cir.1996), which discussed the application of § 1291 in post-judgment proceedings.

The issue in *ACORN* was how the State of Illinois would comply with an injunction ordering it to implement the motor-voter law, which it had ignored based on its belief that the law was unconstitutional. The district court held that the state had to comply with the law, and Illinois then proposed some implementing regulations. The district court entered a post-injunction order holding Illinois' proposed regulations invalid and asking the parties to brief some remaining issues. Illinois then appealed this post-injunction order, which raised the question of appellate jurisdiction. In discussing the finality require-

1. Although the CHA disputes the receiver's right to participate in the appeal, the district court granted the receiver permission to appeal on May 20, 1998. This safeguards the receiver's status before this court. See *Holland v. Sterling Enters., Inc.*, 777 F.2d 1288, 1291 (7th Cir.1985).

ment of § 1291, Chief Judge Posner explained:

> [We] treat the postjudgment proceeding as a freestanding litigation, in effect treating the final judgment as the first rather than the last order in the case. Our decision last June [rejecting Illinois' constitutional challenge to the motor-voter law] kicked off a postjudgment proceeding that will end, unless the parties reach an agreement, with a judicial order setting forth the steps that Illinois must take to comply with the injunction that it obey the motor-voter law. That order will be appealable as a final decision under section 1291; interim orders will be appealable only if they meet the criteria for the appealability of interlocutory orders.

*Id.* at 306.

By analogy to *ACORN*, the CHA claims the February order is final because it sets forth the steps the CHA must take to comply with the injunction. But as the above passage illustrates, *ACORN* does not stand for the proposition that an order outlining the steps to comply with a prior injunction always qualifies as a new final judgment. Instead, it held only that the post-judgment order there was final because it conclusively resolved the parties' claims in the context of that case. This point was underscored in *Bogard v. Wright*, 159 F.3d 1060 (7th Cir.1998), which explained that a court facing an appeal from a post-judgment order must try to treat the post-judgment proceeding as a freestanding lawsuit, to identify the final decision in the proceeding, and to confine a § 1291 appeal to that decision. *Id.* at 1062. Especially with injunctions and consent decrees, it is not always possible to pick out a plausible counterpart to the conventional final judgment. *Id.*; see also *United States v. Accra Pac, Inc.*, 173 F.3d 630, 632 (7th Cir. 1999) ("One of many orders interpreting or implementing a consent decree cannot readily be called 'final', and we have held accordingly that housekeeping orders in long-running cases are not appealable."). Nor does it help to speak of "pragmatic finality," which is too vague to serve as an analogy to the conventional Rule 58 final judgment. *Bogard*, 159 F.3d at 1063. Instead, *Bogard* holds, parties who need to bring a post-judgment order with irrevocable consequences before the appellate court—at least in cases involving decrees entered by consent or after full litigation—must normally either use mandamus or seek an order granting, modifying, denying, or otherwise affecting the injunction itself, which would be appealable under 28 U.S.C. § 1292(a)(1). *Id.*

Any direction the February order gave the CHA about how to comply with the 1969 injunction did not serve to bring finality to this litigation. Under *ACORN* and *Bogard*, therefore, § 1291 does not confer jurisdiction over this appeal.

### 2. Section 1292(a)(1) Jurisdiction

■ The CHA has not requested a writ of mandamus, nor did the district court certify this case for an immediate appeal under 28 U.S.C. § 1292(b). The only possible alternative ground for jurisdiction is thus 28 U.S.C. § 1292(a)(1), which permits appeals from orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions...." The next question is whether the February order does any of those things to an injunction, or if, on the other hand, it is a mere clarification or reiteration of a standing injunction that does not fall within the scope of § 1292(a)(1). See *ACORN*, 75 F.3d at 306. The CHA concedes that the only thing it asked the district court to do was to clarify the injunction, and it acknowledges that this is what the district court said it was doing. It argues, however, that the court's purported clarification resulted in such a blatant misinterpretation of the injunction that it is tantamount to an appealable modification.

This court has repeatedly held that it will look beyond labels such as "clarifica-

tion" or "modification" to consider the actual effect of the order. *E.g., Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149, 1155 (7th Cir.1984); *Buckhanon v. Percy*, 708 F.2d 1209, 1212 (7th Cir.1983). This means the court must take at least a glancing look at the merits of the CHA's arguments in order to decide how to characterize the order. Naturally, we need more than the CHA's own assertion that this particular alleged misinterpretation amounts to a modification. See *Motorola*, 739 F.2d at 1155. Otherwise, appellate courts would be deluged with interlocutory appeals from every litigant dissatisfied with a district court's interpretation of its injunctions. As the Supreme Court has noted, § 1292(a)(1) must be approached "somewhat gingerly lest a floodgate be opened...." *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 24, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); see also *Carson v. American Brands, Inc.*, 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (holding that the interlocutory jurisdiction provided by § 1292(a)(1) is only a narrow exception to the finality rule of § 1291).

Two requirements for appeals under § 1292(a)(1) dealing with post-judgment rulings relating to injunctive decrees emerge from our decisions. First, *Motorola* established that a modification (however labeled) occurs only when a court substantially alters the pre-existing legal relationship of the parties. 739 F.2d at 1155. Second, in *Bogard* we held that it must be apparent or obvious that an order has such an effect before § 1292(a)(1) jurisdiction will be proper. 159 F.3d at 1064. Otherwise, we would have to delve deeply into the merits before we could decide whether we had jurisdiction to reach them. The *Bogard* rule, although it prohibits an all-out inquiry into the merits, does not leave the parties at the mercy of a possible rogue district judge who is wreaking havoc with an injunction or consent decree, because any party who believes that an order has subtly modified an injunction need only move formally for a modification or termination order. See *id.* at 1064–65. Whether the district court grants or denies the requested modification or termination, the resulting order is clearly appealable under § 1292(a)(1). The *Bogard* rule thus redirects litigants to the plain language of the statute. It blocks the statute's "modification" provision from serving as a back door to appellate review of every administrative clarification the district court makes, while it simultaneously retains this court's authority to look behind labels when those labels obviously mischaracterize the order.

Applying these standards to the February order, we conclude that it is not an appealable modification of an injunction. The district court did not, for example, rule that CHA programs other than the administration and construction of dwelling units (like the provision of Section 8 rent vouchers, the management of CHA properties preexisting the injunction, or the conditions under which social services are to be supplied) fell within the sweep of the 1969 injunction. Such extreme actions would be modifications even if the district court labeled them mere clarifications. *Cf. United States v. Board of Sch. Comm'rs*, 128 F.3d 507, 509 (7th Cir.1997) (finding the addition of a class of students formerly outside scope of the injunction to a mandatory busing order to constitute a clear modification of the underlying order). To the contrary, here there is no such obvious misinterpretation that might trigger appellate jurisdiction under § 1292(a)(1). In fact, there may be no misinterpretation at all. The CHA concedes, as it must, that the 1969 injunction's literal definition of dwelling unit (*i.e.*, a residential unit "which is to be initially made available to and occupied by a low-income, non-elderly family, subsequent to the date [of the injunction], directly or indirectly by or through CHA...." *Gautreaux II*, 304 F.Supp. at 737) encompasses new construction made possible by HOPE VI. Appellants' Br. at 15. The CHA urges the court to consider that the context in which the injunction

was drafted somehow belies its wording, but such an analysis would aim to uncover subtle rather than blatant misinterpretations and is therefore too searching for a preliminary jurisdictional inquiry. Under *Motorola* and *Bogard*, we therefore lack appellate jurisdiction under § 1292(a)(1).

## B. The August Order

The only theory under which the parties have urged us to recognize appellate jurisdiction over the August order is as a fresh injunction, appealable under 28 U.S.C. § 1292(a)(1). As before, however, this court must look beyond the "injunction" label of the order to see if jurisdiction is proper. See, *e.g.*, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) ("An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)."); *Carson*, 450 U.S. at 83, 101 S.Ct. 993; *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1156 (7th Cir.1998). The combined *Motorola* and *Bogard* tests once again govern our characterization of the order for jurisdictional purposes: unless it substantially and obviously alters the parties' pre-existing legal relationship, the August order is only an unappealable interpretation or clarification of prior orders, not an appealable new injunction.

The August order does nothing more than reassert the court's prior orders: it tells the CHA that it must continue to comply with the 1969 injunction and February order specifically with respect to the HOPE VI revitalization project at Cabrini–Green, and that it must involve the receiver in any negotiations. Because the proposed settlement with the Cabrini–Green Local Advisory Council addressed, in part, the construction of replacement housing, the receiver was the only party with authority to negotiate the provisions and was therefore indispensable to the negotiations. That the August order also directs the CHA to renegotiate rather than place an illegitimate agreement before another court changes nothing, because that simply ensures that the CHA does not profit from its non-compliance with existing court orders. *Cf. People Who Care v. Rockford Bd. of Educ.*, 171 F.3d 1083, 1086–87 (7th Cir.1999) (finding a budget order creating new payment obligations appealable as a separate injunction). Thus, the August order is not a fresh injunction. It instead merely reiterates and applies the court's prior orders without creating new obligations for the CHA. As such, this court has no jurisdiction to review it.

## C. The May Order

Both parties have argued that the otherwise unappealable May order is so inextricably intertwined with the August order as to trigger our pendent appellate jurisdiction. In addition, the *Gautreaux* plaintiffs offer pendent appellate jurisdiction as a theory that would support the appeal of the February order. Because we have found no appellate jurisdiction over either the August or the February orders, however, pendent appellate jurisdiction cannot be marshaled to bring the May order (or the February order on plaintiffs' theory) before the court. See, *e.g.*, *People ex rel. Hartigan v. Peters*, 861 F.2d 164, 166 (7th Cir.1988).

## III

If the CHA is displeased with the 1969 injunction, the receivership order, or the recent district court orders flowing from them, then it should seek to modify or terminate any or all of them. Until it does so—or until the district court obviously departs from the path of its own precedent—this court will not have appellate jurisdiction.

We therefore Dismiss these appeals for lack of jurisdiction.