In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3578

DOROTHY GAUTREAUX, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CHICAGO HOUSING AUTHORITY and TERRY PETERSON,

*Defendants-Appellants*,

*v.*

DANIEL E. LEVIN and THE HABITAT COMPANY LLC,

*Receivers-Appellees,*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 66 C 1459—**Marvin E. Aspen**, *Judge.*

ARGUED SEPTEMBER 13, 2006—DECIDED JUNE 26, 2007

Before CUDAHY, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* This appeal presents the latest phase of the long-running litigation over racial discrimination in public housing in Chicago that bears Dorothy Gautreaux's name. See *Gautreaux v. Chicago Housing Auth.* (*CHA*), 296 F. Supp. 907 (N.D. Ill. 1969) (*Gautreaux I*) (finding the CHA liable for racial discrimination in site-selection policy and tenant assignment); *Gautreaux v. CHA,* 304 F. Supp. 736 (N.D. Ill. 1969) (*Gautreaux II*)

(entering remedial order). It concerns the district court's decision to grant attorneys' fees to the plaintiffs' attorneys for work they did between August 1, 2001, and July 31, 2003. The CHA, which is responsible for the fees, argues that this court should reverse that order. It starts from the premise that the proceedings before the district court ought to be treated as free-standing litigation. When seen in that light, the CHA continues, the proceedings did not result in the kind of victory for plaintiffs that would make them "prevailing parties" entitled to fees. In the alternative, the CHA urges us to find that even if plaintiffs are entitled to some fees, the district court abused its discretion in the award it granted. We conclude that even if the link between these proceedings and earlier parts of the case is broken, the plaintiffs nonetheless prevailed, and the district court did not abuse its discretion with this fee award. We therefore affirm.

## I

For present purposes, all that is necessary is a summary of the history of the case. More than four decades ago, Dorothy Gautreaux and other African-American tenants who lived in public housing projects, along with applicants for public housing, sued the CHA, claiming that its policies with respect to the selection of sites for public housing and for assignment of tenants were racially discriminatory. The plaintiffs prevailed, see *Gautreaux I*, *supra*, and the district court entered a remedial decree that was designed to ban racially discriminatory site selection and tenant assignment policies and to undo the harm that had already occurred. See *Gautreaux II*, *supra*. Central to the remedial decree was the requirement that for every unit built in an area where the population was more than 30% non-white ("Limited Areas"), the CHA had to construct three housing units in an area where the

population was less than 30% non-white ("General Area"). See *Gautreaux II*, 304 F. Supp. at 737-38. The ratio was later modified to one-to-one. See *Gautreaux v. CHA*, 178 F.3d 951, 953 (7th Cir. 1999). The *Gautreaux II* remedial order also limited new construction of public apartments that had more than three floors and required changes to tenant assignment practices. *Gautreaux II*, 304 F. Supp. at 838-40. The order did not, however, require the construction of any new housing.

The CHA reacted to *Gautreaux II* by instituting a virtual moratorium on the construction of new housing that lasted 18 years. At the plaintiffs' behest, in 1987 the district court appointed Daniel Levin and the Habitat Company as a receiver for the development of all new non-elderly housing for the CHA. See *Gautreaux v. Pierce*, Order of Aug. 14, 1987. This indeed prompted some change: the receiver built a number of small-scale public housing units, which were scattered throughout the General Area. In the 1990s, in part because of the availability of federal funds through the HOPE VI program (an acronym for "Homeownership and Opportunity for People Everywhere"), see 42 U.S.C. § 1437l, repealed by Pub. L. 105-276, Title V, § 522(a), Oct. 21, 1998, 112 Stat. 2564, the CHA developed plans to overhaul its public housing stock.

This culminated in 2000 with the CHA's announcement of the Plan for Transformation (the Plan), which the CHA optimistically describes as a "blueprint for positive change." The Plan outlines how the CHA proposes to replace all of Chicago's high-rise public housing projects with lower density mixed-income developments. See http://www.thecha.org/transformplan/plan_summary.html (last visited June 7, 2007). As CHA's Executive Director, Terry Peterson, explains, the "centerpiece" of the Plan is "the creation of new, low-density, mixed-income communities on the sites and in the neighborhoods where [CHA]

ha[s] demolished the old high-rises. . . . [These develop-ments] will allow public housing families to live in the same kind of housing and the same kind of neighborhoods as other Chicagoans."

In deciding where to locate new construction that will benefit from HOPE VI funds and be subject to the Plan, the CHA has used the locations of the old high-rise projects almost exclusively. These were the same locations that were branded as racially isolated in *Gautreaux I*. They fell within the Limited Areas, in which new construc-tion was restricted by *Gautreaux II*. See *Gautreaux v. CHA*, 178 F.3d at 953-55. In addition, some of the develop-ments contemplated by the plan are mid-rise buildings in which public housing units are located above the third floor. To avoid the *Gautreaux II* restrictions when spending federal dollars, the CHA asked the district court in 1998 "to 'clarify' the judgment order and read it as not govern-ing the use of HOPE VI funds." The court declined to do so; instead, it concluded that "any construction of public housing in Cook County must conform to the judgment order's locational requirements." *Gautreaux v. CHA*, 4 F. Supp. 2d 757, 760 (N.D. Ill. 1998). Other construction under the Plan similarly has continued to operate within the restrictions of *Gautreaux II*'s remedial order.

The result of the continued application of the remedial order to this new construction was, as Terry Peterson attested, that "[t]he *Gautreaux* case presented a major obstacle to the Plan for Transformation. . . . [U]nless the 1969 judgment order was modified, [the CHA] could not proceed with the Plan." What the CHA has had to do, in essence, is to negotiate new building plans with plaintiffs, whenever the Plan would require something inconsistent with *Gautreaux II*. The plaintiffs have been cooperative. Beginning with the redevelopment of the Henry Horner housing project on the City's near west side in 1995, the

plaintiffs repeatedly have joined the CHA in requests for waivers from the district court of various restrictions in its remedial decree, so that construction of replacement public housing units can go forward.

In these joint motions, the *Gautreaux* plaintiffs have never conceded that the limits in the decree are no longer relevant. Rather, they have taken a case-by-case approach to waiver requests. For example, in proposing the waiver of *Gautreaux II*'s conditions for the Horner redevelopment, plaintiffs asked the court to relax the site restrictions because they believed "that a proposed mixed-income redevelopment on and around the . . . site offered the prospect of better housing conditions for plaintiff families in the near term as well as the possibility of racial integration in the future." After the Horner redevelopment, plaintiffs have continued to join the CHA in asking the district court to waive the remedial conditions, but only for redevelopment projects that present the right conditions and only with particular restrictions negotiated by the parties.

The agreed order arrived at by the parties to allow the Horner revitalization to proceed in 1996 provided the model for much of what has occurred over the last decade, including the August 1, 2001, to July 31, 2003, period in which the attorneys' fees at issue were accumulated. During those two years, the district court entered five orders, each of which was agreed to by the parties. The first four were, according to Peterson, "examples of the kind of orders that CHA has sought from the *Gautreaux* plaintiffs so that [it] could proceed with the Plan." An order entered on September 7, 2001, waived the restrictions on units above the third story of any structure in four mid-rise buildings and fourteen walk-ups that were part of the redevelopment of the Cabrini Extension North housing project. An August 29, 2002, order modified *Gautreaux II*'s directives with respect to the Tenant

Assignment plan, giving priority for housing in scattered-site units to individuals and families displaced from their public housing units by the Plan; those units formerly had been earmarked for CHA transfer and waiting-list families. The September 11, 2002, order allowed the building of new mixed-income housing on the sites of the former Ida B. Wells, Darrow, and Madden Park projects in the North Kenwood-Oakland neighborhood. The December 12, 2002, order allowed the expansion of the Horner revitalization area and the construction of an additional 271 units of housing. It also modified the height restriction and released *Gautreaux* funds to be used in the construction. Finally, the order of March 18, 2003, revised the official list of Cook County Limited Area Census Tracts. See *Gautreaux II*, 304 F. Supp. at 742.

Over the years, the *Gautreaux* plaintiffs' attorneys have requested attorneys' fees on a number of occasions for their ongoing work on the case. Since the 1969 judgment, the court has awarded fees on four occasions: (1) for the period from 1965 to 1980, it awarded $375,375 for 3,003 hours of work; (2) for the period from 1984 through 1996, it awarded $1.15 million; (3) for the period from October 16, 1996, to September 24, 1999, it awarded $991,329; and (4) for the period between September 25, 1999, and July 31, 2001, plaintiffs' attorneys received $844,815.38.

The present fee petition requested compensation for work done between August 1, 2001, and July 31, 2003. The district court concluded that the attorneys were entitled to $724,732 in fees and $3,706 in related expenses. In making this award, the district court reasoned that

> [t]he post-decree proceedings and related work for which fees are presently sought are not "clearly separable" from the original judgment order. . . . [T]his case involves post-judgment work and proceedings that are all part of one active equitable case, in which compli-

ance has always been at issue, and modifications and clarifications of the original judgment order must continuously be made to account for changing conditions and circumstances.

In addressing the reasonableness of the fees, the court found that the fees requested were "comparable to the two prior agreed orders involving Plaintiffs' fees." It also found that the plaintiffs' attorneys had appropriately eliminated certain duplicative expenses and had shown that the tasks they performed were within the scope of the consent decree and consistent with the earlier fee orders. Finally, the court was satisfied that the proposed market rates were reasonable. As a result, it granted the requested fees and costs.

## II

We begin by noting that, although this fee order may appear to be "non-final," since it is merely one in a line of similar such orders and nothing in the present record purports to be a final termination of the litigation, appellate jurisdiction is secure. It qualifies as a collateral order that is final for purposes of 28 U.S.C. § 1291, because it finally determines the fee question for the period at issue. See *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); see also *Gautreaux v. CHA*, 690 F.2d 601 (7th Cir. 1982). Our observation in *Alliance to End Repression v. Chicago*, 356 F.3d 767 (7th Cir. 2004), is equally apt here: "Another reason for allowing an immediate appeal is that a decree might never *be* dissolved, so that to treat fee awards as interlocutory might defer appeal to the end of time." *Id.* at 771. Nothing in *Sole v. Wyner*, ___ U.S. ___, 127 S.Ct. 2188 (2007), casts doubt on these rules. *Sole* dealt only with the question whether a party who had won a preliminary injunction but who had ultimately lost on the merits could be a "prevailing party"

for purposes of fees. The Court concluded that it could not, noting at the end of its opinion that it was expressing no view on the question whether, "in the absence of a final decision on the merits of a claim for permanent injunctive relief," fees might sometimes be permissible. Here, of course, the *Gautreaux* plaintiffs did win permanent injunctive relief, albeit relief that has been modified from time to time, and the court's order finally resolved the fee question for the defined period. We thus proceed to the merits of the appeal.

In general, we review a district court's decision to award attorneys' fees for abuse of discretion. *King v. Ill. State Bd. of Elections*, 410 F.3d 404, 411 (7th Cir. 2005). As the Supreme Court pointed out in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), however, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 405. Our review of the underlying legal issues is *de novo.* See *Dupuy v. Samuels*, 423 F.3d 714 (7th Cir. 2005). Here, we must decide whether the *Gautreaux* plaintiffs still qualify as "prevailing parties" for purposes of 42 U.S.C. § 1988, the statute that authorizes fees for successful civil rights plaintiffs.

Under the traditional "American Rule," parties to a lawsuit bear their own costs. *Sole*, 127 S.Ct. at 219 (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 412 U.S. 240, 247 (1975)). In actions brought under 42 U.S.C. § 1983, however, "the court, in its discretion, may allow a prevailing party, other than the United States, a reasonable attorney's fee as part of its costs." 42 U.S.C. § 1988. The district court concluded that, once again, the plaintiffs were "prevailing parties" entitled to attorneys' fees. In its challenge to that finding, the CHA argues that the Supreme Court's decision in *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human*

*Res.*, 532 U.S. 598 (2001), as well as this court's ruling in *Alliance to End Repression v. Chicago*, *supra*, 356 F.3d 767, require a ruling in its favor.

We agree with the CHA that the Supreme Court's decision in *Buckhannon* throws some light on the issue before us, even though it does not directly control the outcome here, for it was a case in which no remedial order ever was entered by the district court. Nonetheless, *Buckhannon* reshaped litigation over attorneys' fee awards. The narrow question before the Court was whether the definition of "prevailing party" in § 1988 included a plaintiff whose lawsuit was a "catalyst" that "achieved the desired result because [it] brought about a voluntary change in the defendant's conduct." 532 U.S. at 600. The Court concluded that this was not enough. Instead, to be considered a "prevailing party" under § 1988 a plaintiff needs to win a "judicially sanctioned change in the legal relationship of the parties. . . . A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change." 532 U.S. at 605. Either an enforceable judgment on the merits or a settlement agreement enforced through a consent decree may qualify as the necessary court-ordered change. Following this logic, we have held that cases in which "the terms of the settlement were incorporated into the dismissal order and the order was signed by the court rather than the parties, or the order provided that the court would retain jurisdiction to enforce the terms of the settlement," have a sufficient judicial imprimatur to entitle the plaintiff to prevailing-party status. *Petersen v. Gibson*, 372 F.3d 862, 866-67 (7th Cir. 2004); see also *T.D. v. LaGrange School Dist. No. 102*, 349 F.3d 469, 478-80 (7th Cir. 2003).

*Alliance* applied *Buckhannon* to postjudgment proceedings, where the underlying case resulted in the entry of

an equitable decree. There, a 1981 consent decree limited the ability of the Chicago Police Department to engage in surveillance of allegedly subversive activities. Plaintiffs' attorneys had asked for fees for legal services rendered in two failed proceedings for contempt, as well as an unsuccessful defense of the consent decree (which wound up being modified). See 356 F.3d at 768-69. This court overturned the district court's fee award, rejecting plaintiffs' argument that their initial victory in the litigation was enough to make them the prevailing party for the life of the decree. *Id*. at 770-74.

*Alliance* necessarily also rejected the argument that post-decree proceedings are inevitably part of only one active, equitable case. At least in the circumstances of *Alliance*, we concluded instead that the particular post-decree proceedings before us had to be evaluated as free-standing litigation. We relied in part on *Buckhannon* in coming to that conclusion. Normally, postjudgment litigation in a complex equitable proceeding is better viewed as largely free-standing from the underlying case. This distinguishes post-judgment efforts from unsuccessful motions made *en route* to the successful conclusion of a lawsuit, which can be compensated as "indispensable inputs in a successful conclusion of litigation." 356 F.3d at 771. In cases like *Alliance*, "the postjudgment proceedings . . . , coming as they did so many years after the consent decree went into effect, are clearly separable from the proceeding that led up to the entry of the decree." *Id*.

The district court here thought that it was enough that the post-decree proceedings for which the plaintiffs sought fees were not "clearly separable" from the original judgment order. After *Alliance,* that strikes us as too lenient a standard. In any event, here as in *Alliance* so many years have passed and so many modifications have been made to the decree, we conclude that we must look at

the time period for which fees are being sought (roughly mid-2001 through mid-2003, as we noted earlier) as free-standing litigation. The question before us is whether the *Gautreaux* plaintiffs were correctly characterized as prevailing parties for that set of proceedings.

In arguing that the plaintiffs are not entitled to be regarded as having won anything notable, the CHA focuses on the transformation of its relationship with the plaintiffs from one of opposition to one of cooperation. Unlike the earlier periods for which the plaintiffs received fees, when the CHA was actively fighting them, it now depicts the parties as essentially all on the same team. (If this were actually the case, there would be a serious question whether any case or controversy remains to be decided. Given our conclusion below that it is not, however, our jurisdiction is not threatened on this basis.)

As the CHA tells the story, whereas it once was obdurate, it now has "scrupulously honored the terms of the judgment order and diligently sought modification of the judgment order so it could properly proceed with the Plan . . . ." Although the CHA cannot make the legal claim that it is in the same position as the defendants in *Alliance*, it makes the same claim rhetorically, casting the plaintiffs as defenders of an obsolete consent decree that serves almost no function. The CHA submits that *Gautreaux* plaintiffs' only role was to "simply acquiesce[ ] in getting out of the way." Implicitly, the CHA is saying that anything plaintiffs do to allow the CHA to implement the Plan cannot amount to *plaintiffs'* success on the merits.

The glaring difficulty for the CHA, of course, is that it is not in the same position as the defendant Chicago Police in *Alliance*, for it remains bound by the district court's 1969 *Gautreaux II* remedial order. In *Alliance*, the

court found that by the time modification was sought, "[t]he decree in its original form had accomplished its purpose and had become obsolete." *Alliance,* 356 F.3d at 774. Here, in contrast, the CHA's motion to "clarify" the decree to reflect the changed circumstances was rejected. There has been no system-wide modification of the injunction and no showing (as of the time the district court ruled here) that the public housing system has been desegregated enough to warrant dissolution or modification of the decree. Importantly, the CHA has never requested such dissolution, even though it did seek clarification of the judgment in 1998. This court has already commented on the fact that this option remains open to the CHA. See *Gautreaux v. CHA*, 178 F.3d at 958 ("If CHA is displeased with the 1969 injunction, the receivership order, or the recent district court orders flowing from them, then it should seek to modify or terminate any or all of them."). As things stand now, we are not at liberty to treat the injunction as though it no longer exists.

*Gautreaux II* is still in effect, and the court's five joint orders between August 2001 and July 2003 were shaped by the remedial decree. The CHA makes two errors in arguing that the *Gautreaux* plaintiffs gained nothing from any of the orders related to the Limited Area revitalization. The first mistake is the confusion of means and ends—a mistake that is apparent in the CHA's characterization of plaintiffs' waiver of some of the dictates of *Gautreaux II*'s remedial order as "relinquishing their own victory." What plaintiffs have sought all along is the desegregation of public housing in Chicago. The *Gautreaux II* remedial order was nothing more than the means by which the district court believed, in 1969, that such desegregation could be effected. The fact that the plaintiffs agreed to give up certain restrictions and that the court agreed to allow CHA to fulfill its obligations through other means does not amount to a white flag from the plaintiffs.

Instead, as the district court has recognized ever since it granted the first limited waiver of *Gautreaux II*'s restrictions for the Horner revitalization in 1995, opinions about how to desegregate public housing have changed over the 30 plus years since the judgment. In addressing the proposed Horner revitalization order, the court remarked that the proposal "addresses a 21st century view of the City of Chicago and its housing problem as opposed to the 1966 view that was properly the view at the time of the filing of the *Gautreaux* litigation." The court's waivers of particular parts of the remedial decree rest on its "being cognizant that the principal remedial purpose of the Orders previously entered in these consolidated cases has been and is to provide plaintiff class families with desegregated housing opportunities*." Gautreaux v. CHA,* Order of Sept. 12, 2002. In accordance with this goal, carefully-tailored waivers have been entered under certain circumstances and for particular geographic areas. The court has allowed housing to be built in Limited Areas only "upon a sufficient showing of 'revitalizing' circumstances such that a responsible forecast of economic integration, with a longer term possibility of racial desegregation, could be made." *Gautreaux v. CHA*, Order of June 3, 1996. These waivers have been agreed to because, in plaintiffs' opinion, they offer a better chance of achieving what the *Gautreaux* suit has always sought—integration in public housing—than would rigid insistence on the provisions of the *Gautreaux II* decree.

The CHA's second error is in failing to recognize that the *Gautreaux* plaintiffs, through their limited waivers of specific portions of the remedial decree, have achieved success on the merits. The CHA admits that the agreed orders are the product of negotiation. For example, in one 1997 motion to the district court, the CHA described the effect of the remedial decree on their building of housing under the Plan: "In the past the CHA has been forced to

negotiate with plaintiff counsel for approval of high-rise developments, such as Horner and Lakefront, that were funded in whole or in part with 'Gautreaux development money.' As a result, the CHA's [*sic*] ends up with an agreed order to present to the Court, *but not the program that it would have created without having to negotiate with plaintiff's counsel*." (Emphasis added.) In 1998, Terry Peterson further described the negotiation of agreed orders:

> It's the waiver process that is the most intrusive . . . . [H]ere's how it goes in reality: CHA needs to get a waiver from the Court to do a Hope VI program. That means the Court will ask us to negotiate with Mr. Polikoff, as plaintiffs' representative. . . .

> Mr. Polikoff will begin the negotiating by first examining what neighborhood it is we're focusing on; next, what buildings do we want to demolish; next what buildings do we want to rehabilitate; next, where are we going to build the replacement housing; and then it's going to go all the way down to tenant selection and then to all of the other miscellaneous things that were brought to the attention of the Court . . . .

> So the negotiation that would be required by the Court, and properly so, would bring the plaintiffs into the whole program. It's very intrusive. . . .

> [T]hey are going to want to negotiate from the beginning, and in order to get an agreed waiver we would have to negotiate.

> Now when the CHA negotiates and they agree on a waiver and they bring it to you, they're not happy with that order. That's what they've been able to negotiate. That's not what they wanted, it's not what they hoped for, but it was what there were able to negotiate.

Plaintiffs could not say it any better themselves. The CHA has had to change its position in order to win plaintiffs' approval of the waiver orders, and that change in position is embodied in judicial orders. The success on the merits that plaintiffs achieved through the agreed orders is most evident in the December 12, 2002, order. The court concluded in this order that it should allow building of more new housing in the Horner Revitalization Area because there has been "a sufficient showing of 'revitalizing' circumstances such that a responsible forecast of economic integration, with a longer term possibility of racial desegregation could be made . . . ." Moreover, the order conferred numerous benefits and powers on the plaintiffs: it gave them control over "the initial location and configuration" of the units in which *Gautreaux* families would be housed above the third floor; it fixed the maximum number of units of public housing (271); it fixed the maximum ratio of public to non-public units that could be built in the designated area (35.5% public housing); it required equal distribution of the public units throughout the complex; it required annual written reports to be provided by the CHA to plaintiffs; and it permitted the plaintiffs to allocate some of the moneys from the "set aside" decree in a companion case (*Gautreaux v. Weaver*, 66 C 1460 N.D. Ill.) to the building of the new housing.

The order of September 7, 2001, reflects the same attention to the plaintiffs' demands. That order rests on a similar conclusion about the possibility of creating "viable mixed-income and desegregated housing opportunities for CHA plaintiff families" in the area in which the restrictions were being waived. The order specified the number of units to be built in each of four mid-rise and 14 walk-up buildings. For example, the order waived the three-story height restriction in the Renaissance North Mid-Rise Building, which was to be built at 535 West

North Avenue and was to have 59 units, 18 of which would be public housing dispersed throughout the building. It did the same for the 11 buildings in the order. The third order dealing with revitalization, issued September 11, 2002, added approximately 100 acres to the North Kenwood-Oakland revitalizing area, which had been the subject of a June 3, 1996, order. The later order identified the portion of the Limited Areas in which the receiver would be permitted to develop up to 850 units of public housing. Finally, a fourth order, issued on August 29, 2002, resulted in an improved procedure for placing families displaced from public housing that had been destroyed as a result of the Plan into scattered-site units, which are all located in the General Area. This was designed to provide housing for the displaced families as well as to try to help reduce chronic vacancy in the scattered-site units built by the *Gautreaux* receiver. Even if the fifth order did not deliver as much relief to the plaintiffs, nothing says that they must have prevailed on every single request during the time period at issue in order to be viewed as "prevailing parties." They achieved substantial results, embodied in court orders, and that is enough.

That the CHA and the *Gautreaux* plaintiffs agreed on these orders cannot mean that the substantial benefits flowing to the latter are not "fruits" of the litigation. *Buckhannon* makes it clear that a judicially sanctioned consent decree is a firm basis for a fee award. See 532 U.S. at 604. We conclude that plaintiffs have met their burden of showing they were awarded "judicial relief" and that they are prevailing parties for § 1988 purposes.

### III

The CHA's final argument is that even if the *Gautreaux* plaintiffs' attorneys merited fees, the district court abused

its discretion by giving them too much. Our review of the amount of fees awarded is highly deferential to the district court: "If ever there were a case for reviewing the determinations of a trial court under a highly deferential version of the 'abuse of discretion' standard, it is in the matter of determining the reasonableness of the time spent by a lawyer on a particular task in a litigation in that court." *Ustrak v. Fairman*, 851 F.2d 983, 987 (7th Cir. 1988). CHA raises three principal objections to the district court's decision, none of which is sufficient to demonstrate that the district court abused its discretion. (We have no comment on the CHA's additional complaints about the adequacy of plaintiffs' counsels' annotated time sheets and the few hours that were eliminated from the plaintiffs' total hour count but not their time sheets, apart from saying that we find no merit in them.)

"In calculating reasonable attorneys' fees, the district court should first determine the lodestar amount by multiplying the reasonable number of hours worked by the market rate." *Bankston v. State of Ill.*, 60 F.3d 1249, 1255 (7th Cir. 1995). "The reasonable hourly rate used in calculating the lodestar must be based on the market rate for the attorney's work. 'The market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 519 (7th Cir. 1993) (quoting *Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 424 (7th Cir. 1992)) (internal citation omitted). "The burden of proving the market rate is on the party seeking the fee award. However, once an attorney provides evidence establishing his market rate, the opposing party has the burden of demonstrating why a lower rate should be awarded." *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir. 1999) (internal citations omitted).

Plaintiffs' attorneys have no paying clients, and so they presented evidence as to what their reasonable fees would have been through the affidavit of Attorney Lowell Sachnoff. He represented that the time of plaintiffs' various lawyers was compensable at the following rates: $400 for lead counsel Alexander Polikoff (who has litigated the case since it was filed); $350 for Julie Elena Brown and Robert L. Jones, Jr.; $265 for Adam Gross; $240 for Jonathan M. Kaden and Mary Anderson; $225 for Nicholas J. Brunick; and $200 for Henry J. Ford, Jr., and Eloise P. Lawrence.

Sachnoff is a director of Business and Professional People for the Public Interest (BPI), the organization that employs plaintiffs' attorneys. The CHA argues that, as a result of this relationship, Sachnoff has an interest in BPI's receiving as large a fee as possible and, therefore, "his self-serving affidavit alone cannot satisfy a plaintiff's burden of establishing market value for that attorney's services." *Uphoff*, 176 F.3d at 408. The district court was aware of Sachnoff's position, however, and was within its discretion to regard this as going to the weight of his evidence rather than its admissibility. Moreover, the district court correctly noted that Sachnoff was just one of more than 40 directors listed on the BPI website, or the more than 50 on the Board as a whole. See *About BPI: Board of Directors*, at http://www.bpichicago.org/board. html (last visited June 7, 2007). Even where the lawyer whose rate is being established works for the firm of the affiant, there is no rule requiring the disqualification of the affiant's evidence about the billing rate. See *Denius v. Dunlop*, 330 F.3d 919, 930-31 (7th Cir. 2003). Second, whatever Sachnoff's incentives, they are not the kind of direct financial incentives that existed in *Uphoff*, the case on which defendant relies. There the district court rejected rates supported only by an affidavit from the lead lawyer in the case, who testified that "all of the requested

hourly rates" that he himself submitted, which also covered the associates and paralegal in his firm, "are commensurate with each respective attorney's market rate." 176 F.3d at 407. Third, although the CHA wants us to accept evidence of the fees it pays attorneys to demonstrate that a lower rate should be awarded, it has offered no convincing argument why the district court was obliged to use the City's pricing structure as a proxy for what the market will bear.

Finally, even if its prior agreements on fee awards does not bind the CHA here, see *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir. 1993) (*en banc*), the rates established there are legitimate evidence as to whether these rates are reasonable. Because many of the lawyers have remained the same, the district court was entitled to find that the comparison was particularly instructive. In March of 2002, for the period covering September 25, 1999, to July 31, 2001, plaintiffs' attorneys were granted fees for which the rates were as follows: $360 for Polikoff; $275 for Brown and Jones; $190 for Gross; $135 for Kaden; and $130 for Brunick, then the most junior lawyer. In June of 2000, for the period covering October 16, 1996, to September 24, 1999, the rates were as follows: $360 for Polikoff; $260 for Brown and Jones; $190 for Gross; and $120 for Kaden, then the most junior lawyer. When this evidence of the prior fees is taken together with the affidavit, we can find no justification for concluding that the district court abused its discretion in approving these rates.

The CHA also objects to the number of attorneys plaintiffs assigned to the case. It is unhappy that plaintiffs used the services of nine lawyers over the two-year period, even though none of the lawyers spent all of his or her time on this project. The greatest number of hours billed by any one attorney over the two-year period was 530.675

by Nick Brunick (notably, an attorney with a billing rate of $225); the fewest was Jonathan Kaden with 28.5.

Use of one or more lawyer is a common practice, primarily because it often results in a more efficient distribution of work. See *Kurowski v. Kajewski*, 848 F.2d 767, 776 (7th Cir. 1988). It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones. Having one lawyer handle all of the work, as the CHA suggests, would not necessarily result in lower costs for the defendant. For example, had plaintiff's lead counsel, Mr. Polikoff, billed all of the hours, the cost to the CHA would have been around $1,029,600—an increase of almost 42% over the $724,732 that plaintiffs actually billed. If Polikoff had been the sole lawyer and the 489 hours of intra-team communications were cut, the bill would still have been around $834,000, more than 15% greater than the fees approved by the district court. Hypothetical illustrations aside, the fact that nearly 65% of the hours billed were for work by attorneys whose fees were at the low end of the range ($200-$265) illustrates how multiple lawyers can lead to a more cost-efficient allocation of work.

The district court also did not abuse its discretion in concluding that the time spent on intra-team communications was compensable. There is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project. Where the district court has found, as it did here, that appropriate trimming took place to bring the billed hours within a reasonable range, it is not this court's job to second-guess that judgment.

The CHA's third and final category of objections focuses on the types of work for which plaintiffs' attorneys billed. CHA complains that the lion's share of this work was

either not related to the postjudgment relief received or it was non-compensable monitoring. CHA points to the work of plaintiffs' attorneys with respect to habitability, tenant assignments, and participation in Working Groups related to the development of certain revitalization projects. On this point, the CHA again has the steep burden of convincing us that the district court abused its discretion when it held that "Plaintiffs have categorized each billing entry to show that the underlying task is within the scope of the [judgment order] and is consistent with the past orders awarding fees to the Plaintiffs."

*Hensley v. Eckerhart*, 461 U.S. 424 (1983), makes clear that while the district court has no authority to order a defendant to pay fees for time spent on matters unrelated to the issues on which plaintiff prevailed, efforts on matters related to the plaintiffs' success are compensable. See *id.* at 435-37. There is no specific formula to be used in determining which efforts of plaintiffs' counsel are related, and appellate review of such decisions is deferential. See *Jackson v. Illinois Prisoner Review Bd.*, 856 F.2d 890, 894 (7th Cir. 1988). So long as the plaintiffs' lawyers' activities are factually related to issues on which the plaintiffs have achieved postjudgment judicial relief and the work was reasonably calculated to result in relief, the district court may grant attorneys' fees.

The district court did not abuse its discretion in finding that the efforts of plaintiffs' attorneys here merited attorneys' fees. This work was related to the successful postjudgment strategies that the plaintiffs pursued: getting new mixed-income public housing built in accordance with specific conditions, as well as ensuring that scattered-site developments in the General Area are habitable and being inhabited—precisely the issues for which the district court has entered orders in this period.

Finally, with respect to the claim that plaintiffs' activities were non-compensable monitoring, the prior agreed fee

orders establish a course-of-dealing in this case that demonstrates what the expectations of the parties and the court were at the time this work was undertaken. In *Alliance*, we held that plaintiffs were not entitled to fees for post-decree monitoring because such activities produced no enforceable order and because the Chicago Police Board had been set up for the purpose of monitoring. See 356 F.3d at 772-73. Plaintiffs' counsel were not "expected to be the enforcers of the decree." *Id.* at 772. Every case is different, however, and here, the court's orders and the course-of-dealing between the parties demonstrates that plaintiffs—at times, in addition to the court-appointed receiver—were expected to be the enforcers of the decree. They could not perform the latter function without at least some monitoring of their own. We cannot find that the district court abused its discretion in finding that the challenged activities of plaintiffs' attorneys were compensable.

**IV**

In the end, the CHA is really arguing that the supervision of the building of public housing by the federal district court is no longer necessary. Plaintiffs have made it clear that they do not share that view. We reiterate what we said in 1999: "If CHA is displeased with the 1969 injunction, the receivership order, or the recent district court orders flowing from them, then it should seek to modify or terminate any or all of them." 178 F.3d at 958. If it does so, all interested parties will have an opportunity to present their views to the district court. That broad issue is not properly before this court. The only question we have been asked to decide is whether plaintiffs' attorneys are entitled to the fees that the district court awarded them for their work from August 2001 through July 2003. We conclude that the plaintiffs are

still "prevailing parties" and that the district court did not abuse its discretion in the amount of the fees it awarded.

The order of the district court is AFFIRMED.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*